## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**KARRI DALTON as the Personal Representative of the**
**Estate of NIKKI BASCOM, et. al,**

                    **Plaintiffs,**

**v.**                                        **Case No. 17-cv-1143 WJ-GJF**

**TOWN OF SILVER CITY, ex rel., et al.,**

                    **Defendants.**

## <u>RESPONSE TO COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT</u>

COME NOW the above-captioned Plaintiffs, through counsel, and respond to County Defendants' Motion for Summary Judgment and Brief in Support ("Motion"). Because there are genuine issues of material fact for all of Plaintiffs' claims against the individual Grant County Sheriff's Department ("GCSD") Defendants—Detective Adam Arellano ("Det. Arellano"), Sergeant Frank Gomez ("Sgt. Gomez"), and Deputy Jacob Villegas ("Dep. Villegas")—who were on notice that their conduct violated the Fourth and Fourteenth Amendments to the United States Constitution, this Court should deny the individual Defendants' Motion. In addition, because there are genuine issues of material fact as to whether GCSD had an unconstitutional pattern and practice of encouraging unlawful entry into private residences and because its negligent conduct resulted in a battery that deprived Nikki Bascom's ("Nikki's") children of her care and guidance, this Court should deny GCSD's motion for summary judgment on Plaintiffs' *Monell* and state law claims against it as well.

## BACKGROUND

Silver City Police Department ("SCPD") Captain Marcello Contreras (Cpt. Contreras) shot and killed Nikki—mother of two, a nurse supervisor, and the captain's ex-girlfriend—and then himself on April 21, 2016. This did not surprise SCPD and GCSD officers. On scene of the murder/suicide,

GCSD and SCPD officers commented, "They've been dealing with [Cpt. Contreras] all afternoon. All day, actually;" "He was on a rage;" "It makes me sick because I knew this was going to happen" and "He was determined today, dude." Through multiple reports by Dr. Derrick Nelson (the man with whom Cpt. Contreras believed Nikki was in a relationship, hereinafter "Dr. Nelson"), Nikki, and Cpt. Contreras, himself—GCSD officers had learned there had been two previous reports to SCPD before the day of the murder/suicide regarding Cpt. Contreras's threatening behavior and that following one of the incidents Nikki had "alarming bruises." They also learned on the day Cpt. Contreras killed Nikki that Cpt. Contreras had stopped Nikki because she was in the area of Dr. Nelson's home and ripped her phone out of her hand; he had gone to Dr. Nelson's house while on duty to threaten the doctor; he had followed Nikki from the SCPD to her home; he had repeatedly entered Nikki's home without permission; and that Nikki feared for her life. Though Cpt. Contreras's danger to Nikki was apparent, foremost, GCSD did not protect her because its deputies treated Nikki differently than they would any other victim and, conversely, Cpt. Contreras differently than they would any other suspect. Because GCSD forced Nikki to shoulder their burden, Nikki had to protect her children from Cpt. Contreras, leaving her vulnerable. Nikki saved her children, but not herself.

## I.  Plaintiffs' Response to Defendants' "Undisputed" Material Facts

1.      *At the time of his contact with Dr. Nelson, Dep. Villegas had no authority to arrest [Captain] Contreras because he had not threatened Dr. Nelson. Dep. Villegas was going to review the information he obtained with the District Attorney's office.*

**Disputed, in part.** Dr. Nelson made the first report GCSD officers responded to on April 21, 2016. Both Sgt. Gomez[1] and Dep. Villegas spoke to Dr. Nelson; Dep. Villegas arrived first, but he waited to take a statement from Dr. Nelson until Sgt. Gomez arrived. GCSD Dispatch, p. 1, attached as **Ex. A**; Sgt. Gomez's Depo. 9:24-25; 10:1, attached as **Ex. B**. Sgt. Gomez and Dep. Villegas had

---

[1] Defendants' attempt to minimize Sgt. Gomez's involvement in investigating Cpt. Contreras's criminal conduct on April 21, 2016, because of his shocking statements later in the day to Cpt. Contreras.

authority—and, in fact, an obligation under state law—to arrest Cpt. Contreras. Dr. Nelson told Sgt. Gomez and Dep. Villegas that Cpt. Contreras had gone to Dr. Nelson's home—in uniform, in his police unit and armed—and aggressively told Dr. Nelson that "I already warned you. Messing with my family….We'll see;" "Pull out that gun and see what happens;" and "I'm telling you right now, you haven't seen the last." Transcript of Dep. Villegas interviewing Dr. Nelson (Derrick 1), pp. 3:13-20; 8:11-17, attached as **Ex. C**; Transcript of Cpt. Contreras audio recording recorded by Dr. Nelson, attached as **Ex. D**, pp. 2-3. Cpt. Contreras did so with his hands near his firearm. Transcript of Dep. Villegas interviewing Dr. Nelson, (Derrick), p. 13:16-18, attached as **Ex. E**. Dep. Villegas testified that Cpt. Contreras's conduct may have justified assault charges, and he said the same on scene that day. Dep. Villegas Depo., p. 11:7-12, attached as **Ex. F**; **Ex. E**, p. 13:7-9. Dr. Nelson felt so threatened by Cpt. Contreras he armed himself with a pistol when Cpt. Contreras came to his home. **Ex. C**, p. 8:11-17. Dr. Nelson recorded Cpt. Contreras threatening him with his cell phone, and he played the recording for Sgt. Gomez and Dep. Villegas. **Ex. C**, p. 9:7-17; **Ex. D**.

Dep. Villegas and Sgt. Gomez also learned Cpt. Contreras had previously threatened Dr. Nelson in the Walgreens parking lot on March 25, 2016, and that Nikki had reported that incident to Chief Ed Reynolds ("Chief Reynolds") of the SCPD. **Ex. F**, p. 15:12-18; **Ex. C**, p. 6:14-18. Specifically, Dr. Nelson reported that Cpt. Contreras had told him "you're gonna get hurt, just you wait, I'm gonna hurt you" while he was in the parking lot and that Nikki had to physically separate the two. **Ex. C**, p. 4:9-13. Dep. Villegas thought that too may be a crime and followed up on the allegation when he spoke to Nikki later that day "in order to see if there was a pattern." **Ex. F**, p. 18:2-14.

Dr. Nelson also told Sgt. Gomez and Dep. Villegas that while he and Nikki were out-of-state together for work, Nikki and Cpt. Contreras argued back and forth by phone, and Cpt. Contreras called Dr. Nelson's phone incessantly, but Cpt. Contreras had blocked his caller ID. **Ex. E**, p. 2:4-18. Dr. Nelson learned it was Cpt. Contreras who had called him repeatedly when Cpt. Contreras texted

him demanding Dr. Nelson answer his phone. **Id.** This went on for several days, call after call. **Id.** In addition, a few weeks previous to April 21, 2016, Dr. Nelson reported he had also received 19 calls in a row from a blocked number. **Ex. E**, p. 2:20-25. Dr. Nelson also told Sgt. Gomez and Dep. Villegas that he had seen "alarming bruises" on Nikki after the Las Vegas trip and that her son had called the police (the SCPD), but nothing official had been done. **Ex. E**, p. 7:18-24.

Individually, Cpt. Contreras's conduct constituted two separate assault charges and two batteries. Taken together, Cpt. Contreras's conduct constituted stalking, which requires a "pattern of conduct," meaning two or more acts, that causes an individual reasonable apprehension of bodily harm, NMSA 1978, § 30-3A-3, and harassment, which "consists of knowingly pursuing a pattern of conduct that is intended to annoy…another person and that serves no lawful purpose." NMSA 1978, § 30-3A-2. Both Sgt. Gomez and Dep. Villegas had the duty to write an arrest warrant and call the court to get that warrant signed that day. **Ex. F**, p. 26:21-25. They chose not to do so, even though Dep. Villegas had done so in other life-threatening situations. **Ex. F**, p. 27:9-17.

Dep. Villegas claims he intended to present his investigation of Dr. Nelson's report that Cpt. Contreras had threatened him to the District Attorney's office ("DA"). However, that was "due to the complexity of the case itself, [and Dep. Villegas and Sgt. Gomez] felt it would be better to forward it to the DA's to see what they could get approved for," but he never did. **Ex. F**, pp. 25:5-10; 25:14-20. Dep. Villegas does not always seek a DA's review prior to filing charges. **Ex. F**, p. 25:5-10. Sgt. Gomez instructed him to do so in this case because "[t]here was a SCPD officer involved. And the nature of the call that came…[he] was more comfortable going to the district attorney's office for their review." **Ex. B**, p. 11:1-6.

4.    *Sgt. Gomez spoke to [Captain] Contreras and issued him the criminal trespass warning. [Cpt. Contreras] explained that he followed [Nikki] and Dr. Nelson because he suspected them of having an affair and that is why he confronted Dr. Nelson.*

**Disputed as incomplete** to the extent the statement suggests that is all Cpt. Contreras told

4

Sgt. Gomez about his interactions with Nikki and Dr. Nelson. After Sgt. Gomez and Dep. Villegas left Dr. Nelson's house, they went to Nikki's residence, where Cpt. Contreras told the pair he had threatened Dr. Nelson that morning because he had seen Nikki in the area of Dr. Nelson's house. **Ex. F**, p. 30:1-12.

5.  *Contreras told Dep. Villegas he lived in [Nikki's] residence.*

**Disputed as incomplete** to the extent that the statement suggests this was all the information Sgt. Gomez and Dep. Villegas had about Cpt. Contreras's residency. While standing outside Nikki's house, Cpt. Contreras told Sgt. Gomez and Dep. Villegas that Nikki's father owned the home, and that Nikki did not want him in the home. **Ex. F**, pp. 30:25; 31:1; and Transcript of Sgt. Gomez's lapel camera video, p. 7:12-25, attached as **Ex. G**. And Nikki told Sgt. Gomez and Dep. Villegas that Cpt. Contreras had not lived in the home for over a month, she had changed the locks, and Cpt. Contreras had been entering her home without her permission. **Ex. G**, pp. 12:21-25; 13:1-18. Nikki even offered to provide Sgt. Gomez and Dep. Villegas with a receipt that would indicate the exact date she changed the locks. **Ex. G,** pp. 12:21-25; 13:1-15.

6.  *Chief Reynolds allowed [Captain] Contreras to enter the residence, his license indicated he lived at the residence and [Captain] Contreras said he lived at the residence.*

**Disputed as incomplete** to the extent that the statement suggests that Sgt. Gomez or Dep. Villegas knew the address listed on Cpt. Contreras's driver's license. Although Sgt. Gomez and Dep. Villegas asked for Nikki's driver's license, they did not ask to see Cpt. Contreras's license. **Ex. G**, p. 12:19-20. In addition, see Plaintiffs' response to Defendants' "Undisputed" Material Facts 5, immediately preceding.

7.  *Sgt. Gomez obtained [Captain] Contreras's [sic] home address from dispatch.*

**Disputed.** See Plaintiffs' response to Defendants' "Undisputed" Material Facts 5 and 6. Cpt. Contreras was not living at Nikki's home when Sgt. Gomez called dispatch.

9.  *Dep. Villegas was not investigating anything other than the issue concerning Dr. Nelson, because no one,*

*including [Nikki,] asked him to investigate anything else. In her interaction with Dep. Villegas and Sgt. Gomez, [Nikki] never stated that she feared for her safety or that [Captain] Contreras [had] previously engaged in domestic violence.*

**Disputed.** Nikki called 911 to report that her "ex" was following her. **Ex. A**, p. 2. To the extent a crime victim must request an investigation, a 911 call is a request for investigation. Nikki also reported to Sgt. Gomez and Dep. Villegas that: (i) she and Cpt. Contreras had been separated since the beginning of March (**Ex. G**, p. 13:4-12); (ii) Cpt. Contreras had followed her that morning on her way to her home from the police department (**Ex. G**, p. 10:12-16); (iii) she did not feel comfortable going home by herself while Cpt. Contreras was there (**Ex. G**, pp. 10:5-7; 10:21-23); (iv) Cpt. Contreras had not been living in Nikki's home for over a month and had been entering through a broken back door because he did not have a key (**Ex. G**, pp. 12:21-25; 13:1-18); and (v) Cpt. Contreras had confronted Dr. Nelson at Walgreens (**Ex. G**, pp. 17:20-25; 18:1-18). Nikki did not tell Sgt. Gomez and Dep. Villegas this information because they were friends: she told them because they were law enforcement officers and she hoped they would do something to address Cpt. Contreras's criminal conduct.

Nikki also tried to provide the officers with a receipt documenting when she changed the locks on her home and, therefore, how long Cpt. Contreras had not been living in it, but Sgt. Gomez and Dep. Villegas were not interested in that evidence. **Ex. G**, pp. 12:21-25; 13:1-15. This, too, constitutes a request for Sgt. Gomez and Dep. Villegas to investigate a crime.

Sgt. Gomez and Dep. Villegas were well aware Nikki feared for her safety. She told them she was not comfortable being alone with Cpt. Contreras. **Ex. G**, pp. 10:5-7, 21-23. Cpt. Contreras himself told them that he had illegally stopped her that morning. **Ex. G**, pp. 17:20-25; 18:1-18; 6:7-17. And, in apparent recognition of the danger posed by Cpt. Contreras, Sgt. Gomez asked where Nikki's children were and suggested Nikki pick up her child before going to the domestic violence shelter. **Ex. G**, pp. 14:20-25; 15:9-11.

Sgt. Gomez and Dep. Villegas did not investigate anything. If they can be fairly characterized to have conducted any investigation, Plaintiffs agree that Sgt. Gomez and Dep. Villegas only focused on the two incidents with Dr. Nelson and Cpt. Contreras despite having considerable information about other crimes Cpt. Contreras had committed and having been dispatched to Nikki's home because Cpt. Contreras was following her. **Ex. G**, p. 7:12-14. They also focused on the crimes involving Dr. Nelson despite Sgt. Gomez referring to the information Nikki provided to him as domestic violence. **Ex. G**, p. 19:10-13 ("Like I said, as far as the domestic violence, that's…my best advice…").

Plaintiffs also dispute Sgt. Gomez and Dep. Villegas's motivation for not investigating the other crimes Nikki reported and Cpt. Contreras had admitted. They did not fail to investigate because no one had asked them to do so. They failed to investigate because Nikki's complaints concerned a police officer with whom she was previously in a relationship. For example, before Sgt. Gomez and Dep. Villegas spoke to Nikki, Sgt. Gomez asked Cpt. Contreras's permission to do so. **Ex. G**, p. 8:18-19 ("I'm just going to talk to her. See what she wants. Okay?"). He also told Cpt. Contreras that he "would rather be drinking a cold one or something" than addressing Nikki's complaints. **Ex. G**, p. 8:11-12. Sgt. Gomez assured Cpt. Contreras that "fucking I hate to get involved in this though (sic) [bro]" **Ex. G**, p. 3:2-4, and that "[w]e're going to just write it up" **Ex. G**, p. 3:6-7, and "not going to put nothing over the air, dude, or nothing like that." **Ex. G**, p. 3:16-17. Sgt. Gomez said he did not want to put anything over the air because it was awkward and embarrassing that law enforcement was involved in the incident and "Grant County is scanner land, and everybody hears stuff." **Ex. B**, p. 22:10-24. He was uncomfortable that the allegations involved an officer, stating "it's sad when a situation like that happens, but—especially from one officer to another, investigating it." **Ex. B**, pp. 14:18-25; 15:1. He also called Cpt. Contreras "bro" **Ex. G**, p. 4:11-12, and assured Cpt. Contreras that there was nothing to the allegations Dr. Nelson had reported. **Ex. G**, p. 4:3-4.

In addition, see Plaintiffs' Additional Material Facts "a-rrr", which also create a material dispute of fact whether Sgt. Gomez and Dep. Villegas's treated Nikki differently because her allegations were against a fellow law enforcement officer.

10.    *[Nikki] indicated that she was going to El Refugio to get a restraining order.*

**Disputed, in part**. After Sgt. Gomez told Nikki there was nothing he could do to keep Cpt. Contreras out of her home and that it was "a big civil issue," Nikki stated that she would go to El Refugio. **Ex. G**, pp. 13:22-25; 15:9-12. But Dep. Villegas told Nikki to pick up her daughter from school before going to El Refugio, which she agreed to do. **Ex. G**, p. 14:14-25; 15:3-11.

11.    *[Detective] Arellano was dispatched immediately once he started his shift on the day of the incident.*

**Disputed, in part.** According to Det. Arellano, GCSD Sergeant Yost asked him to go to El Refugio. Det. Frank Arellano Depo., p. 31:22-24, attached as **Ex. H**.

12.    *Because he was dispatched, [Detective] Arellano did not attend the shift change briefing and was unaware of Contreras's activities.*

**Disputed, in part.** Det. Arellano did not attend the shift change briefing, but dispatch gave him information that Cpt. Contreras was "possibly [at El Refugio] causing problems for Nikki." **Ex. H**, pp. 31:22-25; 32:1.

13.    *[Nikki] told [Detective] Arellano that Contreras had stayed at her home for the past couple of nights.*

**Disputed as incomplete** to the extent this statement suggests this is all Nikki told Det. Arellano related to Cpt. Contreras's residency. In addition, Nikki told Det. Arellano that Cpt. Contreras had been living at his mother's house for over a month and that he had taken his stuff out of her home. Transcript of lapel camera of Det. Arellano, pp. 10:24-25; 11:1-2, attached as **Ex. I**. She also told him Cpt. Contreras did not have a key to her house, **Ex. I**, p. 9:23-24, the house was not in Cpt. Contreras's name, **Ex. I**, p. 13:22-23, and that he did not have access to the home, **Ex. I**, p. 10:7-8.

14.    *[Nikki] can be heard saying that she did not want to share information with [Detective] Arellano and instead*

*was going to share it with the El Refugio employee. [Nikki] also state[d] that when she saw [Captain] Contreras en route to El Refugio, he did not engage in any threatening behavior, she was simply afraid he would return.*

**Disputed as incomplete** to the extent that the statement suggests Nikki did not provide information to Det. Arellano before shutting down. Nikki was only reluctant to talk to Det. Arellano after he was short and rude, *see* Affidavit of Tammy Dean, VOCA Crisis Form, ¶¶ 16, 18, attached as **Ex. J**, and Nikki told him the following and he took no action in response: (i) she and her ex, Cpt. Contreras, have had issues going on for a while, **Ex. I**, p. 5:9-10; (ii) Cpt. Contreras had stopped her while driving that morning, "ripped" her phone out of her hand, and said she was "screwing everybody" that she worked with, **Ex. I**, p. 5:12-20; (iii) SCPD had gotten Nikki's phone back and returned it to her, **Ex. I**, pp. 5:25; 6:1-2, (iv) she did not "dare to go to [her] house by [herself]" because she was scared, **Ex. I**, p. 6:7-8; (v) Cpt. Contreras had followed her from SCPD to her home that morning, **Ex. I**, p. 6:10-13; (vi) Cpt. Contreras was not in his right mind, **Ex. I**, p. 7:22-24; (vii) she did not feel comfortable, **Ex. I**, p. 8:1-2; (viii) Cpt. Contreras had followed her to El Refugio because he knew she was going to the shelter, **Ex. I**, p. 8:7-13; (ix) her daughter saw Cpt. Contreras following her to El Refugio as well, **Ex. I**, p. 8:7-9; (x) Cpt. Contreras had been stalking her over the past month and she had not previously reported all of his conduct, **Ex. I**, p. 8:17-19; (xi) earlier that day he had followed her all the way back to her house, **Ex. I**, p. 8:15-19; (xii) Cpt. Contreras had not lived in the home since the beginning of March, she had changed the locks, and Contreras's belongings were at his mother's home, **Ex. I**, pp. 9:21-25; 10:1-25; 11:1-2; (xiii) SCPD had let Cpt. Contreras get his belongings from Nikki's residence "a while ago" through the broken back door, **Ex. I**, pp. 9: 24-25; 10-1-2; (xiv) they were not married and the house was not in Cpt. Contreras's name, **Ex. I,** p. 13:20-23; (xv) Cpt. Contreras refused to leave her home, **Ex. I**, p. 6:21-23; (xvi) there were guns in her home, **Ex. I**, p. 9:14-15; (xvii) Cpt. Contreras would not accept that she did not want to be with him, **Ex. I**, p. 11:4-6; and, finally, (xviii) Nikki expressed fear she would not live to see the next day, **Ex. I**, p. 14:11-12.

16.     *When [Detective] Arellano left El Refugio, it was with the understanding that she would remain at El Refugio and would obtain the restraining order with their assistance.*

**Disputed.** Det. Arellano only hoped that Nikki and El Refugio would obtain a restraining order, but he was not certain that she would be able to do so. **Ex. I**, pp. 14:7-10; 16:5-8.

### II.  Plaintiffs' Additional Material Facts

a.      On March 9, 2016, Nikki's son called 911 and reported that his step-father, Lt. Contreras, had threatened suicide. Deposition of Chief Ed Reynolds, pp. 81:8-25; 82:1, attached as **Ex. K**. Although SCPD did not document the 911 call in a police report or CAD, Dr. Nelson told Sgt. Gomez and Dep. Villegas about it and that he had observed "alarming bruising" on Nikki after the incident. Deposition of Captain Ricky Villalobos pp. 15:20-25; 26:1-14, attached as Plaintiffs' **Ex. M**; **Ex. E**, p. 7:18-24.

b.      After this incident, Lt. Contreras moved into his mom's home. Cpt. Freddie Portillo Depo., p. 21:20-22, attached as **Ex. L**; **Ex. K**, p. 91:1-7.

c.      Before Sgt. Gomez and Dep. Villegas went to Dr. Nelson's home or received a call that Cpt. Contreras had followed Nikki from the SCPD to her home, on the morning of April 21, 2016, Nikki reported to SCPD that (i) Cpt. Contreras had cut her off to stop her while driving, pulling his car quickly in front of hers and forcing her to the side of the road; (ii) Cpt. Contreras was on duty and in uniform when he did so; and (iii) Cpt. Contreras accused Nikki of "fucking her boyfriend" and ripped the phone from her hand, possibly while she was trying to call 911.

d.      Although SCPD did not document the incident in a police report or CAD, Nikki told Sgt. Gomez and Dep. Villegas that Cpt. Contreras had stopped her that morning, and Cpt. Contreras admitted to Sgt. Gomez and Dep. Villegas that he had followed and stopped Nikki that morning and that he had gone to Dr. Nelson's house. **Ex. G**, pp. 17:20-25; 18:1-18; 6:7-17. Nikki also told Det. Arellano that Cpt. Contreras had stopped her while driving that morning, "ripped" the phone out of

her hand, and said she was screwing everybody she worked with. **Ex. I**, p. 5:12-20.

e.     Sgt. Gomez knew Cpt. Contreras from work and trainings. **Ex. B**, p. 15:2-9.

f.     Det. Arellano had worked with Cpt. Contreras at SCPD in 2003 and 2004. **Ex. H**, pp. 17:20-22; 27:23-25; 28:1-5.

g.     Det. Arellano and Cpt. Contreras were on friendly terms. **Ex. H**, p. 28:8-10.

h.     Domestic violence calls are complex. **Ex. F**, p. 19:10-12.

i.     Victims can be emotional and fearful about family and financial implications. **Ex. F**, p. 20:9-14.

j.     In domestic violence cases, "it is very important whenever [officers] have enough to make an arrest to make an arrest. Of course, that is also protection for the victim. And also…if you can get an emergency protection order, which is another tool that [law enforcement] can use now, to go ahead and do that. If for some reason the individual is not there to be able to effect an arrest, issue an arrest warrant as soon as possible." **Ex. L**, p. 9:17-25.

k.     According to GCSD policy, domestic violence occurs when a family or household member commits or attempts to commit, among other things, physical harm, severe emotional distress, assault, criminal trespass, harassment, and stalking. Grant County Sheriff's Department Domestic Violence Policy No 5, attached as **Ex. N**.

l.     GCSD officers are required to make an arrest for domestic violence upon probable cause, and "field release" is not permitted. **Id.** If GCSD officers cannot make an immediate domestic violence arrest because they cannot locate the perpetrator, "then the case officer shall obtain a warrant for arrest." **Id.**

m.     Generally, GCSD officers follow their policies. For example:

        i.     In one domestic violence case, Det. Arellano attempted to locate a domestic violence suspect who had left the scene and, once located, arrested the subject for misdemeanor

battery without a warrant. See Sworn Affidavits and Statements of Probable Cause, p. 1-2, attached as **Ex. O**.

ii.   Sgt. Gomez responded with two officers to a verbal domestic dispute that had been defused, so the officers left. Three minutes later, they were dispatched to the same residence again, because a woman had thrown ice at a man and one of the ice cubes hit the man. **Ex. O**, p. 3. GCSD arrested the woman for battery without a warrant.

iii.   Another deputy issued an arrest warrant for larceny and criminal damage to property when a woman reported that her boyfriend had taken one of her phones and damaged another. **Ex. O**, pp. 4-5.

t.   Generally, GCSD officers investigate allegations in domestic violence cases. For example:

i.   Sgt. Gomez exhaustively spoke to a couple regarding allegations of domestic violence and documented his investigation in detail. **Ex. O**, pp. 6-8.

ii.   Sgt. Gomez and Dep. Villegas exhaustively investigated another woman's domestic violence allegations. **Ex. O**, pp. 9-11.

u.   In exigent circumstances, law enforcement can fill out a form, call a judge, and get an emergency order of protection entered in an hour or two. **Ex. L**, p. 10:1-15.

v.   GCSD officers attend Biennium Domestic Violence Trainings, **Ex. H**, pp. 24:22-25; 25:1-6, El Refugio's annual trainings, **Ex. J**. ¶¶ 10-11, and other trainings hosted by the District Attorney's office. **Ex. H**, pp. 24:22-25; 25:1-6**.**

w.   GCSD deputies are also trained that in the majority of cases women do not want to report that they have been the victim of domestic violence. **Ex. F**, p. 19:19-25; 20:1; **Ex. H**, pp. 24:22-25; 25:1-6. Deputies know that they must build rapport with a victim in order to establish trust, and sometimes it can take up to an hour and a half before a victim will open up to law enforcement. **Ex. F**, p. 20:2-7. It is therefore important to be patient with domestic violence victims. **Ex. F**, p. 20:7-8.

x.      With patience, Dep. Villegas has been able to establish trust and get a victim of domestic violence to open up to him after the victim had initially denied being a victim. **Ex. F**, p. 21:14-25; 22:1-5.

y.      Dep. Villegas has offered domestic violence victims escort to El Refugio in the past. **Ex. F**, p. 38:18-25; 39:12-15.

z.      GCSD officers are usually respectful and follow the training the shelter has provided when responding to victims of domestic violence. **Ex. J**, p. 2, ¶ 19.

aa.     El Refugio trains county officers, in part, not to stand when talking to domestic violence victims because it can be intimidating. **Ex. J**, p. 2, ¶¶ 11, 12.

bb.     Det. Arellano, Sgt. Gomez, and Dep. Villegas all testified that it is GCSD policy that once a person establishes residency—apparently achieved after anyone stays in another person's residence for thirty continuous days—the owner of the residence cannot ask the person to leave unless civilly evicted. **Ex. H**, p., 55:10-16; **Ex. B**, p. 23:15-20; **Ex. F**, p. 32:3-10.

cc.     When Sgt. Gomez and Dep. Villegas spoke to Cpt. Contreras at Nikki's residence, Cpt. Contreras made clear that he knew GCSD's residency policy. **Ex. G**, p. 7:17-18.

dd.     Though Cpt. Contreras admitted he did not own Nikki's home to Sgt. Gomez and Dep. Villegas, and that Nikki did not want him in her home, Sgt. Gomez told him "No, that will work, dude." **Ex. G**, pp. 7:12-18, 8:2-10.

ee.     When Sgt. Gomez and Dep. Villegas spoke to Cpt. Contreras, it did not appear that Cpt. Contreras had removed anything from Nikki's home, yet. **Ex. F**, p. 37:5-10.

ff.     Sgt. Gomez and Dep. Villegas spoke to Cpt. Contreras after Chief Reynolds met Cpt. Contreras at Nikki's home. **Ex. F**, pp. 33:4-25; 34:1-3.

gg.     Nikki told Sgt. Gomez and Dep. Villegas that Cpt. Contreras knew the residency policy. **Ex. G**, pp. 13:10-25; 14:1-7.

hh.     When Nikki questioned Sgt. Gomez and Dep. Villegas about the residency policy, Sgt. Gomez told her it was legal for Cpt. Contreras to be in her home. **Ex. G**, pp. 11:3-4, 13:19-24.

ii.     When Sgt. Gomez and Dep. Villegas spoke to Nikki at her residence, they only spoke to Nikki for approximately 9 minutes. See Plaintiff's **Ex. T**, lapel camera video of Sgt. Gomez, which will be lodged with the Court.

jj.     Sgt. Gomez and Dep. Villegas did not bother to ask Nikki about her 911 call reporting that Cpt. Contreras had followed her from SCPD to her home. **Id**.

kk.     Sergeant Gomez told Nikki to contact GCSD, not the state police, because the county was handling her reports. **Ex. G**, pp. 15:21-25; 16:1.

ll.     Even if Sgt. Gomez had learned that Cpt. Contreras was on duty when he stopped Nikki that morning, it would not have made a difference to Sgt. Gomez because, according to him, police officers can stop persons with whom they are in a relationship while on duty. **Ex. B**, p. 21:2-6.

mm.     Neither Sgt. Gomez nor Dep. Villegas offered Nikki an escort to El Refugio. **Ex. T**.

nn.     Neither Sgt. Gomez nor Dep. Villegas offered to help Nikki get an emergency restraining order, either, even though Dep. Villegas thought the situation was dangerous enough to advise her to pick up her child from school. **Ex. G**, pp. 14:23-25; 15:3-11.

oo.     When Sgt. Gomez and Dep. Villegas left Nikki's home, Cpt. Contreras's truck was still parked at Nikki's house. **Ex. F**, p. 38:7-17.

pp.     Sgt. Gomez testified that he had not contacted anyone with the SCPD on April 21, 2016, but he had. **Ex. B**, p. 29:3-14; see also **Ex. K**, p. 125:1-3, where Chief Reynolds identifies the 12:43 p.m. call as a conversation with Sgt. Gomez; Verizon phone detail logs, attached as **Ex. P**; Silver City Press article indicating Sgt. Gomez's phone number, attached as **Ex. Q**.

qq.     Sgt. Gomez spoke to Cpt. Contreras's co-captain, Cpt. Villalobos at 12:38 p.m. Chief Reynolds called Sgt. Gomez at 12:43 p.m. **Id**. Cpt. Villalobos called Sgt. Gomez at 2:09 p.m. **Ex. P**. Sgt. Gomez

called Cpt. Villalobos at 2:27 p.m. **Id.**

rr.    At shift change, Sgt. Gomez briefed GCSD Sgt. Yost that Cpt. Contreras had either assaulted or harassed Dr. Nelson, Sgt. Gomez or Dep. Villegas was going to do a report on the incident, and Sgt. Gomez or Dep. Villegas was going to seek the district attorney's office's input on any charges against Cpt. Contreras. Sgt. Yost depo, p. 22:1-24, attached as **Ex. R**.

ss.    Sgt. Gomez also told Sgt. Yost that he had issued a Criminal Trespass Warning ("CTW") to Cpt. Contreras for Dr. Nelson's home and that he had advised Nikki to go to El Refugio, but he was not sure she was going to go. **Ex. R**, pp. 22:1-24; 24:5-19.

tt.    Det. Arellano stood the entire time he spoke to Nikki at El Refugio; did not respond appropriately given the situation; was short with Nikki; and seemed to want to end the interview. **Ex. J**, p. 2, ¶¶ 10, 15, 16.

uu.    In response, to Nikki's report of all the information that Nikki provided to Det. Arellano, set forth in Plaintiffs' Response to Defendants' "Undisputed" Facts 14, above, Det. Arellano told Nikki that she needed to get a restraining order—"hopefully" that day—but that service of restraining orders goes through a different division, **Ex. I**, pp. 13:12-15; 14:7-10; 16:6-11

vv.    Det. Arellano also told Nikki that he understood why SCPD had contacted GCSD to handle her reports, but that GCSD covered a much larger area than SCPD and they would not be able to respond to her calls as quickly, **Ex. I**, p. 15:3-12; and Nikki needed to stay at the shelter, **Ex. I**, p. 14:9-25.

ww.    Det. Arellano claims he believed Nikki's allegations against Cpt. Contreras were already being investigated by GCSD and there was "nothing new…nothing for [Det. Arellano to act upon]." **Ex. H**, pp. 58:4-25; 59:1-24.

xx.    According to Det. Arellano, Nikki's reports (as detailed in Plaintiffs' Response to Defendants' "Undisputed" Facts 14, above) could have constituted false imprisonment, felony larceny, domestic

battery, and intentional interference with communication. **Ex. H**, P. 75:21-25; 76:1-14.

yy.     Although Nikki had reported that Cpt. Contreras had committed multiple crimes, including

felonies, and Det. Arellano acknowledged that Nikki had reported potential felonies and an immediate

arrestable offense, Det. Arellano did nothing to ensure Cpt. Contreras's crimes were investigated or

that he was arrested and merely suggested that the shelter relocate Nikki. **Ex. H**, pp. 63:5-25; 64:1-14;

**Ex. I**, p. 14:22-25.

zz.     After Det. Arellano left El Refugio, Ms. Dean apologized for his demeanor. **Ex. J**, p. 2,

¶ 21.

aaa.     Ms. Dean and Nikki also discussed Nikki's interactions with GCSD officers on April 21, 2016.

**Ex. J**, p. 2, ¶ 22.

bbb.     Ms. Dean did not think Nikki was safe with SCPD or GCSD based on what she had learned

from Nikki and her experience that in a small city and county "a lot of dumb stuff happens" and law

enforcement does not take allegations as seriously when the allegation is against a co-worker. **Ex. J**,

p. 3, ¶ 30.

ccc.     Nikki told Ms. Dean that she strongly believed Cpt. Contreras had gone back into her home

to retrieve personal firearms and a couple thousand dollars. See VOCA Form attached to **Ex. J**.

ddd.     Nikki told Ms. Dean that she needed to leave to get her son and some of her belongings, and,

though worried, Ms. Dean understood why Nikki needed to do that. **Ex. J**, p. 3, ¶¶ 26, 31.

eee.     Ms. Dean talked to her supervisor about her concerns regarding how Det. Arellano handled

his interview of Nikki and they called GCSD to complain about his conduct after the incident. **Ex. J**,

p. 3, ¶¶ 32-33.

fff.     Ms. Dean and her supervisor met with GCSD Undersheriff Kevin Flamm ("Undersheriff

Flamm") at El Refugio to complain about Det. Arellano's conduct with Nikki as well. **Ex. J**, p. 3, ¶

34.

ggg.     Around 3:30 p.m., after Nikki left El Refugio to get her son, Dr. Nelson called 911 to report that he had seen Cpt. Contreras near his home and Sgt. Yost spoke to him. **Ex. A**, p. 3.

hhh.     Sgt. Yost told Dr. Nelson that GCSD would do frequent patrol of his neighborhood. **Ex. A**, p. 3.

iii.     While conducting frequent patrol, around 4:05 p.m., Det. Arellano spoke with Dr. Nelson's neighbor about seeing a rust-colored pickup truck coming in and out of the area at a high rate of speed. **Ex. A**, p. 4.

jjj.     While patrolling the area near Dr. Nelson's home, Sgt. Yost saw Cpt. Contreras's vehicle approaching, so he turned around and followed him because he wanted to prevent Cpt. Contreras from harassing the doctor further. **Ex. R**, p. 43:7-20; **Ex. K**, p. 154:1-24.

kkk.     Sgt. Yost was not aware that Cpt. Contreras had threatened, or was alleged to have threatened, suicide previously **Ex. R**, p. 39:2-21, that Cpt. Contreras had previously threatened Dr. Nelson in the Walgreens parking lot, **Ex. R**, pp. 38:22-25; 39:1, or that Nikki had reported she had changed the locks to her home and Cpt. Contreras had been entering without her permission. **Ex. R**, p. 40:4-8.

lll.     Sgt. Yost believed that he could not stop Cpt. Contreras because he did not have probable cause. **Ex. R**, p. 47:10-17.

mmm.    Sgt. Yost had no indication that Cpt. Contreras would go after Nikki and was focused on protecting Dr. Nelson. **Ex. R**, pp. 49:22-25; 50:1-14.

nnn.     There was not a warrant out for Cpt. Contreras's arrest.

ooo.     Sgt. Yost stopped following Cpt. Contreras after four or five minutes. **Ex. R**, p. 44:3-4.

ppp.     Cpt. Contreras pulled up behind Nikki and her best friend, who were both parking vehicles at her best friend's house. See New Mexico Supplemental Report, pp. 7-8, attached as **Ex. S**.

qqq.     Nikki was in one car, alone; her children were in the car with her best friend. **Id.** When Nikki saw Cpt. Contreras, she screamed at her friend to leave. **Id.** Nikki stayed behind.

rrr.     Cpt. Contreras shot and killed her and then killed himself at 4:23 p.m.

## ARGUMENT

### I. Legal Standard

Qualified immunity at summary judgment is a two-pronged inquiry:

> The first asks whether facts, [t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right[.] . . . The second prong of the qualified-immunity analysis asks whether the right in question was 'clearly established' at the time of the violation.

*Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (internal quotation marks and citations omitted, alterations in original). "Courts have discretion to decide the order in which to engage these two prongs. But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Id.*

### II. Equal Protection

"Equal protection 'is essentially a direction that all persons similarly situated should be treated alike.'" *Grace United Methodist Church v. City Cheyenne*, 451 F.3d 643, 659 (10th Cir. 2006) (citation omitted). "Although there is no general constitutional right to police protection, the state may not discriminate in providing such protection." *Watson v. City of Kansas*, 857 F.2d 690, 694 (10th Cir. 1988). That is, the state cannot afford "less police protection to victims of domestic assault than to other assault victims." *Id.*; *see, e.g.*, *Bartalone v. Berrien County*, 643 F. Supp. 574, 577 (W.D. Mich. 1986) ("Simply stated, defendant … may have violated plaintiff's constitutional right to equal protection of the laws if he intentionally failed to act on her … complaint at least in part because she was a spouse seeking protection from an abusive husband."). Nor can it offer robust protections for domestic violence victims generally, while intentionally denying those protections for certain types of domestic violence victims absent an "articulated rational government reason for such discrimination." *Price-Cornelison v. Brooks*, 524 F.3d 1103, 1114-1115 (10th Cir. 2008). Officers can be held individually liable for their own conduct, and it is no defense that individual defendants are merely following a

discriminatory policy. *Id.* at 1114-15. These principles are all clearly established in the Tenth Circuit. *Id.*

The *Price-Cornelison* plaintiff was in an abusive relationship with her same-sex partner. *Id.* at 1105-07. When the plaintiff's abuser threatened to kill her, she applied for a permanent restraining order, which was eventually granted. *Id.* at 1107. The abuser violated the order, crawling under the plaintiff's fence. *Id.* When the plaintiff called the county sheriff's office, they told her that they were busy and were not going to help. *Id.*

The plaintiff sued, alleging that the county and its undersheriff deprived her of equal protection of the law by failing to enforce Oklahoma's domestic violence laws. *Id.* at 1108. To support her claim, the plaintiff presented a case in which the same undersheriff immediately enforced a domestic violence restraining order involving a heterosexual couple, and contrasted that to the inaction she faced in her case. *Id.* at 1110-11. The Tenth Circuit concluded that the plaintiff "asserted sufficient evidence to show that [the undersheriff] himself treated [her] less favorably than he treated other domestic violence victims." *Id.* at 1113. Because there was evidence of an unwritten policy of differential treatment, the Court further held that a jury could infer the undersheriff's discriminatory intent. *Id.* ("[O]nce the existence of a municipal policy or custom has been shown, courts have assumed that the injurious actions of the individual police officers were taken pursuant to that policy, not merely on their own."). Although the plaintiff was not a member of a protected class, the Tenth Circuit, applying rational basis scrutiny, could not discern any "rational reason to provide less protection to lesbian victims of domestic violence than to heterosexual domestic violence victims." *Id.* at 1113-14.

Relying on *Watson v. City of Kansas*, the Court further held that it was clearly established as early as 1988 in the Tenth Circuit that the state may not discriminate in providing police protection. *Id.* at 1114. The Court noted that "*Watson* reached this conclusion specifically in the context of addressing

police protection afforded to domestic abuse victims[,]" and was "therefore sufficient to put [the undersheriff] on notice" that he could not provide the plaintiff with less protection than other domestic violence victims without articulating a rational government reason for such discrimination. *Id.* at 1114-15.

### A.   A Jury can Conclude that Plaintiff was Denied Equal Protection Because she was in a Relationship with a Law Enforcement Officer

Plaintiffs have presented sufficient evidence for a jury to infer that GCSD Defendants intentionally denied Nikki equal protection of New Mexico's domestic violence laws and GCSD's own policies, based, at least in part, on her status as a domestic violence victim in a relationship with a law enforcement officer. Whether this is characterized as "class-based" or "class-of-one" discrimination, *e.g.*, *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1216 (10th Cir. 2011), there is simply no conceivable basis for Nikki's treatment in this case other than an improper motive, unrelated to the officers' public duties, to deprive Nikki of protection from her ex-boyfriend, a fellow law enforcement officer, in a manner that would not be imposed upon any other victim. The law was clearly established. Defendants' only argument, that state constitutional law prohibited the officers from making a warrantless arrest, misses the mark by ignoring all of Cpt. Contreras's criminal conduct and all options—other than arrest—available to the officers.

### 1.   Disparate Treatment

Despite that the two most important witnesses in this case are dead, Plaintiffs have presented sufficient, admissible evidence that the GCSD Defendants treated Nikki differently than other domestic violence victims in substantially similar circumstances.

For instance, GCSD ordinarily adheres to New Mexico state law, which "give[s] victims of domestic abuse special protections because they are especially vulnerable." *State v. Gonzales*, 2017-NMCA-___, ¶ 24, 406 P.3d 534 (June 28, 2017), *cert. denied*, No. S-1-SC-36557 (August 15, 2017). When a victim of domestic violence reports abuse, state law requires responding officers to "assist in

placing the victim in possession of the dwelling or premises[,]" NMSA 1978, § 40-13-7(B)(4) (2008), assist the victim in securing a restraining order, *id.*, which can be issued *ex parte* over the phone on an emergency basis, NMSA 1978, 40-13-3.2 (2008), investigate the report as a crime, NMSA 1978, § 29-1-1 (1979), and arrest the offender when appropriate, § 40-13-7(B)(5). These duties are incorporated into GCSD's written policies, including its mandatory arrest and warrant policies, which require GCSD officers to make an arrest upon probable cause that any person has committed a domestic violence offense—unless an immediate arrest cannot be made, in which case, "the case officer shall obtain a warrant for arrest."

GCSD officers are not inept. As described above, they are trained extensively on state law and on the county's policies and they ordinarily apply their training in the field. They attend the state's biennium trainings, additional trainings offered by the DA's office, and El Refugio's annual trainings, which are hosted at the local shelter. According to El Refugio's victim's advocate, all deputies usually follow their training when interviewing victims of domestic violence. They know that victims are often reluctant to report abuse and take time to open up. They understand the importance of making an arrest upon probable cause in a domestic violence case, as "protection for the victim," and they know to pursue an arrest warrant as soon as possible "if for some reason the individual is not there to be able to effect an arrest." For domestic violence victims who are not victims of officer-involved domestic violence, all three of the individual defendants have previously aggressively enforced the law, patiently interviewing victims and witnesses, arresting domestic abusers on site, pursuing arrest warrants when needed, escorting victims to the shelter, and thoroughly documenting their investigations.

Despite having abundant information that Cpt. Contreras had committed crimes and engaged in a pattern of harassment, the individual defendants did not adhere to the county's policies or their own usual practices in this case. Contrary to prior cases, which he testified to in his deposition, Dep.

Villegas, who was on scene with both the victim and the offender, made no attempt to build rapport with the victim or establish her trust during the course of his abbreviated investigation. Although Dep. Villegas had information that this was a life threatening situation, and although he has previously pursued an arrest warrant under less threatening circumstances, he did not do so in this case. At a minimum, Dep. Villegas had previously escorted victims of domestic violence to a shelter. Here, he did not. And it is undisputed that Dep. Villegas does not always seek the DA's approval prior to filing charges. But, according to Sgt. Gomez, he intended to do so in this case because an officer was involved.

By his own admission, Sgt. Gomez afforded Nikki disparate treatment. He was side-by-side with Dep. Villegas at Dr. Nelson's, and again at Nikki's house, and he knew everything that Dep. Villegas knew about Cpt. Contreras. At all relevant times, for example, the two officers knew that Cpt. Contreras had threatened to engage in a gunfight with Dr. Nelson related to Nikki. They even heard audio of the threat recorded on Dr. Nelson's phone. While Sgt. Gomez has previously conducted exhaustive criminal investigations and made warrantless arrests in domestic violence cases, he arrived at Nikki's house in this case, knowing that a volatile Cpt. Contreras—who was technically on duty— had followed her home. He spoke to Cpt. Contreras first and heard him admit that he stopped Nikki earlier that day, an act that constituted false imprisonment. Simple follow-up questions would have revealed that he also robbed Nikki and carried away her cellphone. He then asked the captain's permission to speak to the victim, told Cpt. Contreras that he "hate[s] to get involved" and would rather be drinking a beer than investigating complaints against him, and assured Cpt. Contreras that he would not put the CTW out over the radio to protect his privacy because "Grant County is scanner land." A reasonable jury can conclude that Sgt. Gomez, a sworn law enforcement officer with a duty to conduct investigations, make arrests, and file reports, does not ordinarily apply this approach. Additionally, a reasonable jury can conclude, based on his phone records set out above, that Sgt.

Gomez lied about his conversations with SCPD that day in order to protect himself and fellow officers from liability.

Contrary to his training, Det. Arellano stood during his interview with Nikki; he was "short" with her, and, according to the victim's advocate at El Refugio, "unusually rude for an officer responding to a domestic violence victim." Det. Arellano, who has previously attempted to locate a domestic violence suspect that left the scene and, at least once located, arrested the suspect without a warrant, did not follow GCSD's mandatory domestic violence arrest policy, nor its warrant policy in this case, even though he knew that Cpt. Contreras was alleged to have committed various crimes and had been engaging in a pattern of harassment, including following Nikki to the shelter itself. He further knew that Nikki did not feel safe, that she did not think that she would live to see another day, and that Nikki's reports, according to the detective's own deposition testimony, involved allegations of false imprisonment, felony larceny, domestic battery, breaking and entering, and intentional interference with communications, which Det. Arellano had a state law duty to investigate.

Despite his undisputed knowledge, Det. Arellano made no attempt to locate the offender and left the shelter without even filing a police report. His only explanation was that another agency was already investigating. His behavior was so unusual that the victim's advocate and her supervisor complained to the GCSD Undersheriff about it. Specifically, the victim's advocate, who routinely processes domestic violence complaints in the county, has stated that the detective's conduct fit within a pattern in which local law enforcement "sometimes think they're friends with someone, or they work with someone and it's not that serious[.]"

From this evidence, it is virtually impossible to conclude that the individual defendants did not treat Nikki disparately in this case. Sgt. Gomez has admitted as much and the jury can draw reasonable inferences with respect to the other two defendants.

**2. Discriminatory Intent**

23

"The equal protection clause requires [a law enforcement officer] to perform his duties without intentionally discriminating on an irrational basis." *Bartalone*, 643 F. Supp. at 576; *see Snyder v. Smith*, 7 F.Supp. 3d 842, 865-66 (S.D. Ind. 2014) (collecting cases). Rarely do state actors admit a discriminatory intent. When they do—*i.e.*, when a motive to discriminate appears on the face of the state law or action—"an intent to discriminate is presumed" and no further examination is necessary. *Lewis v. Clark*, 577 F. App'x 786, 795 (10th Cir. 2014). That is the situation with Sgt. Gomez, who has admitted that he conducted his investigation differently *precisely* because of Nikki's status as a particular type of domestic violence victim—a victim complaining of abuse by fellow law enforcement. These admissions include Sgt. Gomez's alleged decision to forward criminal allegations to the DA because they involved law enforcement, his subsequent decision not to put the CTW out over the radio because he did not want to embarrass Cpt. Contreras, and his testimony that he believes law enforcement officers are entitled to pull over persons they are in a relationship with while on duty.

A jury can infer discriminatory intent with respect to the remaining officers. "It is not necessary to demonstrate that the challenged action was taken solely for discriminatory purposes; it is necessary only to prove that a discriminatory purpose was a motivating factor." *Watson*, 857 F.2d at 694. At summary judgment, all inferences must be drawn in favor of the nonmovant and this Court's role is only to determine whether there "is a genuine issue for trial." *Tolan*, 134 S. Ct. at 1866, 68. An inference of intentional discrimination can be drawn from the same evidence of disparate treatment that is detailed above. That is, from the officers' failure to follow state law, their own mandatory arrest and arrest warrant policies, their training, their familiarity with the suspect, and their unusual interactions with Nikki and Cpt. Contreras, there is a genuine factual dispute about the officers' intent. Moreover, the officers' actions should not be considered in a vacuum. The issue should be considered in the context of Ms. Dean's and Sgt. Gomez's statements, and Sgt. Gomez's demeanor—referring to Cpt. Contreras as "bro," deferring to the captain's interpretation of the law on residency, and suggesting

that he would rather be drinking a cold one than enforcing the law—which indicate a county-wide custom of protecting law enforcement officers and putting their accusers at risk.

Having established the prima facie elements of an equal protection claim, there is no colorable argument—nor have Defendants asserted one—that any rational basis existed for the differential treatment. *See Price-Cornelison*, 524 F.3d at 1113-14; *Snyder*, 7 F.Supp. 3d at 863 ("[S]tifling an investigation because of extramural personal entanglements with the suspects is the very archetype of a lack of justification based on public duties for singling out the plaintiff."). The remaining elements of Plaintiffs' claim, *i.e.*, causation, present a jury question, because if any of the GCSD officers had gotten an arrest warrant, Sgt. Yost would have stopped Cpt. Contreras prior to the killing.

### 3.  Qualified Immunity

Defendants are not entitled to qualified immunity. The doctrine "gives government officials breathing room to make reasonable but mistaken judgments about *open legal questions*." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (emphasis added). "The salient question . . . . is whether the state of the law at the time of an incident provided fair warning to the defendants that their alleged conduct was unconstitutional." *Tolan*, 134 S.Ct. at 1866 (alterations, internal quotations marks, and citation omitted). "[G]eneral statements of the law are not inherently incapable of giving fair and clear warning to officers, but in light of pre-existing law the unlawfulness must be apparent." *White v. Pauly*, 137 S. Ct. 548, 552 (2017). "[T]here can be the rare obvious case, where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *McCoy v. Meyers*, 887 F.3d 1034, 1045 (10th Cir. 2018). A fact-to-fact comparison is not required when distinctions in the facts make no constitutional difference. *See Kerns v. Bader*, 663 F.3d 1173, 1186-87 (10th Cir. 2011); *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004) (The qualified immunity analysis is not "a scavenger hunt for prior cases with precisely the same facts."). While excessive force cases tend to evaluate claims in which law enforcement officers must make "split-second decisions" that

turn on minor distinctions in the facts, *see Graham v. Connor*, 490 U.S. 386, 396 (1989), no similar level of factual specificity is required to put officers on notice of obviously wrongful conduct that is not subject to factbound, multi-factor legal tests.

The Tenth Circuit has recognized these principles in its most recent qualified immunity decisions. For example, in *Doe v. Hutchinson*, the defendant, a teacher and football coach, allegedly "routinely and openly spoke to and about female students in sexualized terms." No. 17-3070, 2018 WL 1565671, at *1 (10th Cir. Mar. 30, 2018). The defendant "relie[d] heavily" on the excessive force analysis in *White v. Pauly*, arguing that there was no "clearly established" equal protection violation because no prior teacher-on-student equal protection case involved only verbal harassment. *Id.* at *4. The Tenth Circuit rejected the argument outright because "the question is not whether the facts of [a prior case] were sufficiently similar to those alleged in Doe's complaint, but whether our case law would make it clear to reasonable officials that Hutchinson's alleged conduct created a hostile environment." *Id.* The same logic applies here.

If anything is clearly established in constitutional law, it is that officers of the state have a duty to enforce the law equally. "[S]elective withdrawal of police protection," as when the Southern states refused to protect black citizens during the Reconstruction era is "the prototypical denial of equal protection." *Hilton v. City of Wheeling*, 209 F.3d 1005, 1007 (7th Cir. 2000). In fact, it is the willful failure to apply state law with an even hand that motivated Congress to pass Section 1983. *Monroe v. Pape*, 365 U.S. 167, 174-76 (1961). Although this case does not involve race-based discrimination, it is clearly established that the Equal Protection clause applies also to protect persons who are not members of a protected class. *E.g.*, *Price-Cornelison*, 524 F.3d 1103; *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000). Stated otherwise, for qualified immunity purposes "the constitutional right to be free from invidious discrimination is so well established and so essential to the preservation of our constitutional order that all public officials must be charged with knowledge of it." *Austin v. Long*, 779 F.3d 522 (8th Cir.

26

2015); *Elliot-Park v. Manglona*, 592 F.3d 1003 (9th Cir. 2010). While there is no case in which officers have faced the exact factual situation presented here, a law enforcement officer does not need an instruction from an appellate court to know that he cannot undermine a domestic violence investigation for the improper purpose of protecting a fellow law enforcement officer against his accuser. "It strains credulity that any police officer, even if he failed entirely to keep in touch with the pronouncements of higher courts, would ever believe in good faith that such conduct was consistent with his duty to enforce the law evenhandedly." *Snyder*, 7 F.Supp.3d at 867. The Tenth Circuit has previously held that it is a clearly established violation of the Equal Protection clause for officers to irrationally provide unequal treatment to domestic violence victims, *Watson*, 857 F.2d at 694, and for officers to differentiate between categories of domestic violence victims without a rational basis for doing so. *Price-Cornelison*, 524 F.3d at 1114-15. That is all that Plaintiffs are alleging, and that is sufficient to give Defendants fair warning about their constitutional duties.

### 4. Defendants' Argument

With respect to the equal protection claim, Defendants argue only that (1) "no one has the right to have someone arrested[,]" (2) Plaintiffs have presented no evidence that Defendants "would have arrested a non-law enforcement officer under the same circumstances," and (3) state constitutional law has imposed particular requirements—specifically, "exigent circumstances"—for making a warrantless felony arrest. Motion at 11-12 (*citing State v. Paananen*, 2015-NMSC-031, 357 P.3d 958). The argument is unsound. It presents a false dilemma because arrest was neither the only option, nor the only duty the officers had, and it fails in any event on its own terms because an arrest was lawful and typical under the circumstances. As for *State v. Paananen*, Plaintiffs agree that the case is instructive. The case supports Plaintiffs' position.

A law enforcement officer in New Mexico does not need a warrant to make an arrest upon probable cause that the suspect committed a felony outside the officer's presence if there is "some

exigency" involved that reasonably prevented the officer from first securing a warrant. *Campos v. State*, 1994-NMSC-012, ¶ 14, 117 N.M. 155, 870 P.2d 117. There is sufficient exigency for a warrantless felony arrest when an officer develops probable cause while already on scene with the alleged offender. *State v. Paananen*, 2015-NMSC-031, ¶ 24, 357 P.3d 958. On the other hand, even if there is no exigency involved, the question becomes whether it is reasonable not to conduct a more extensive investigation or else "reasonable not to procure an arrest warrant." *Id.* ¶ 15. This comports with other requirements of state law, *e.g.*, NMSA 1978, § 40-13-7(B) ("A local law enforcement officer responding to the request for assistance shall be required to take whatever steps are reasonably necessary to protect the victim from further domestic abuse."), as well as GCSD's own policies, which mandate a domestic violence arrest "when probable cause and legal authority exist to make an arrest," and require deputies to diligently pursue an arrest warrant if they cannot immediately locate the perpetrator.  In short, whether or not there is sufficient exigency to make an immediate arrest, a law enforcement officer that intentionally fails to enforce the law in the same manner he would to protect other domestic violence victims (for example, by failing to get a warrant) violates clearly established law and is liable for his conduct. *Price-Cornelison*, 524 F.3d 1103.

When a misdemeanor assault or battery upon a household member is involved, an officer can arrest the suspect upon probable cause and without a warrant, even if the crime alleged occurred outside the officer's presence. NMSA 1978, § 31-1-7 (1979, as amended through 1995). The officer must make the warrantless misdemeanor arrest "at the scene" of the alleged domestic disturbance. *State v. Almanzar*, 2014-NMSC-001, ¶ 20, 316 P.3d 183. The test for whether an officer is "at the scene" is a test of reasonableness, requiring the officer to make the arrest "close to the scene both spatially and temporally." *Id.* Again, if the officer cannot legally make the arrest—for instance, if the offender is not on-scene—he or she still has a clear legal duty to protect the victim from further domestic abuse. § 40-13-7(B).

Defendants make no argument that they lacked probable cause to make an arrest. Motion at 11-12. That argument would not be tenable in any event, given Cpt. Contreras's admissions, the recorded audio of Contreras making unlawful threats, Nikki's reports, and the officers' own observations. *See Benavidez v. Shutiva*, 2015-NMCA-065, ¶ 13, 350 P.3d 1234 ("Probable cause requires more than a bare suspicion of criminal activity, but it does not require evidence sufficient to support a conviction."). For example, by itself, Cpt. Contreras's admission that he "stopped Nikki" without lawful justification gave officers probable cause to arrest him for false imprisonment. And Nikki's statement that Cpt. Contreras was entering her home without her permission gave the officers probable cause to arrest Cpt. Contreras for breaking and entering. *State v. Rubio*, 1999-NMCA-018, ¶¶ 2, 11, 126 N.M. 579, 973 P.2d 256 (concluding that a person in an "on-again, off-again relationship with the victim that was 'off'" at the time he enters the victim's home without permission commits the offense of breaking and entering).

Defendants instead argue only that there were no exigent circumstances. As discussed above, the exigent circumstances requirement of New Mexico law was satisfied here with respect to Sgt. Gomez and Dep. Villegas, because both officers were on scene with the alleged offender when they developed probable cause that Cpt. Contreras was harassing and stalking Nikki, falsely imprisoning her by pulling her over, and criminally trespassing or breaking into her home. *See Paananen*, 2015-NMSC-031, ¶ 24. An immediate arrest would have been lawful, consistent with Grant County policies, and consistent with Sgt. Gomez's own past practice of making warrantless arrests in domestic violence cases—for instance, by making the warrantless entry of a home to apprehend a female suspect accused of throwing ice at a household member, as described in Plaintiffs' Additional Material Facts.

Of course, a warrantless arrest was not the only option for any of the three officers. *Paananen* actually analyzes a law enforcement officer's options when he is on scene with the suspect in a domestic violence case. *Id.* ¶ 25. The New Mexico Supreme Court did not even consider the option

of doing nothing and leaving the scene without filing a report or notifying other officers of a CTW over the radio. That would violate the officer's duty to enforce the law. NMSA 1978, § 29-1-1. In fact, law enforcement officers with probable cause to make an arrest of a domestic violence suspect on scene have three options: (1) immediately arrest the offender on site; (2) detain the offender while they get a warrant; or (3) release the offender while they get a warrant. *Paananen*, 2015-NMSC-031, ¶ 25. This third option, according to the Supreme Court, is costly and unreasonable. *Id.* There is no colorable argument that making a field release and *failing to pursue a warrant at all* in violation of well-settled state law and Grant County policy is somehow required by *Paananen*.

The question for the Court is whether there is evidence (or any reasonable inference that can be drawn) that these officers intentionally behaved differently in this case than they would have had the victim not been in a relationship with a law enforcement officer. For the reasons stated above, this matter must be decided by jury.

### III. Fourth Amendment

Independent of Plaintiffs' equal protection claim, the Fourth Amendment clearly prohibits state actors' unlawful entries into homes and the warrantless seizure of property therein. *Burdeau v. McDowell*, 256 U.S. 465, 475 (1921). Here, Plaintiffs allege an unlawful county "custom or usage" that empowered Cpt. Contreras to break into Nikki's home, in violation of New Mexico criminal statutes, and to remain in the home with police support, because he knew, under county policy, he had established "residency" in Nikki's home. Furthermore, by communicating to Nikki that Cpt. Contreras's entry of her home was legal, Sgt. Gomez and Dep. Villegas dissuaded Nikki from otherwise protecting her legal rights by calling state police, having Cpt. Contreras arrested, and preventing him from ultimately retrieving guns and cash from the property.

The unlawful county policy in this case enjoyed the force of law and caused the deprivation of Nikki's Fourth Amendment rights. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 168-69 (1970) (state

law enforcement customs can have the force of law). In *Adickes*, the Supreme Court established that a state is responsible for the unconstitutional acts of a private person when a state custom compelled the private citizen to violate the constitution. *Id.* The *Adickes* decision has resulted in widespread recognition that the action of a private individual is attributable to the state when the state has provided "such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *In re Santa Fe Nat. Tobacco Co. Mktg. & Sales Practices & Prod. Liab. Litig.*, 288 F. Supp. 3d 1087, 1171–72 (D.N.M. 2017), *citing Blum v. Yaretsky*, 457 U.S. 991, 993 (1982).

Herein, the county policy empowered Cpt. Contreras to violate New Mexico's criminal laws. Plaintiffs allege that the county policy allowing a guest to establish residency in a home provided significant encouragement to Cpt. Contreras, who knew the policy, to break into Nikki's home and remain there. The county policy took from Nikki the right to exclude a criminal from her home. The county then supported Contreras and dissuaded Nikki from protecting her own rights when Dep. Villegas and Sgt. Gomez told Nikki that Contreras had a lawful right to enter and remain.

The county policy is unique and wholly without legal support. In fact, Cpt. Contreras's acts constituted criminal trespass and breaking and entering under New Mexico law. NMSA 1978, § 30-14-1 (1995); NMSA 1978, § 30-14-8 (1981). An unauthorized entry in New Mexico is any entry without "legal right or privilege or without permission of a person legally entitled to withhold the right." *Rubio*, 1999-NMCA-018, ¶ 8 (citations omitted). A person who has lived in a residence in the past, may not enter a dwelling of another without authorization. *Id.* In *Rubio*, the New Mexico Court of Appeals upheld the defendant's conviction for breaking and entering into his girlfriend's apartment even though he was often an overnight guest and had property inside the apartment. Thus, county policy allowing a guest to establish "residency" after thirty days unlawfully creates a property interest in a dwelling for a guest. Cpt. Contreras knew of the county's policy and cited it when he told Dep. Villegas and Sgt. Gomez that Nikki could not exclude him from her own home.

In addition to the county policy encouraging Cpt. Contreras's unlawful acts, Dep. Villegas and Sgt. Gomez encouraged Cpt. Contreras and dissuaded Nikki from protecting her rights by their behavior at the scene. The state actor does not need to cross the threshold to be liable for the unlawful entry into a home when he, by words or actions, encourages another to enter a home. *Price-Cornelison*, 524 F.3d at 1118, n.13, *citing Marcus v. McCollum*, 394 F.3d 813, 816 (10th Cir. 2004). When reviewing whether police action "actually aided" a Fourth Amendment violation, the Tenth Circuit employs a "particularly fact-sensitive" inquiry, examining all facts "in their totality." *Id.* at 1117 (citation omitted).

In a claim of wrongful repossession, the *Marcus* court cited various factors that courts consider in determining whether law enforcement aided a private party in seizing property. *Id.* These factors include whether the officer "told the debtor that the seizure was legal." *Id.* The Tenth Circuit in *Price-Cornelison* subsequently relied on this factor in a domestic violence case in which the plaintiff sought to prevent her abuser from entering her home to seize property after the two split up. 524 F.3d at 1115-18. The county officer incorrectly represented to the plaintiff that the abuser's entry of her home and seizure of property was legal and that the plaintiff would be arrested if she intervened, which dissuaded her from protecting her own rights. *Id.* at 1117. The Tenth Circuit held that the county officer violated clearly established law and was not entitled to qualified immunity. *Id.* at 1118.

In this case, Grant County policy encouraged Cpt. Contreras to enter and remain in Nikki's home unlawfully. Contreras knew Grant County policy and, indeed, cited to Grant County policy when he told Gomez and Villegas that they had no right to exclude him from Nikki's home. They agreed and told Nikki the same. Grant County policy gave Contreras a property interest in Nikki's home when none exists in state law. In fact, state law is clear that an owner of a home retains the right to exclude any guests at any time. New Mexico law squarely addresses the right of a guest to unlawfully enter a home and comes down emphatically on the side of the homeowner. By sanctioning Cpt. Contreras's entry, telling Nikki the entry was legal, and then telling her not to call the state police, the

officers in this case effectively weighed in on the side of an illegal entry that violates clearly established principles of state and federal law.

Sgt. Gomez, Dep. Villegas and Det. Arellano all testified that the policy allowed a guest to establish residence after residing in a home for 30 days. No one could testify as to the source of the policy nor cite to the New Mexico statute that provides for a property interest in a guest, because there is no such New Mexico law. Plaintiff has provided sufficient evidence of a policy. A jury should decide whether the policy provided significant encouragement to Contreras to break into Nikki's home and remain there against her wishes. The law provides significant power to a homeowner to exclude unwanted guests. Nothing in the law requires a homeowner to get a court order to prevent a burglar or trespasser from remaining in her home. Indeed, the criminal law is designed to quell breaches of the peace.

### IV. State Law Claims

The New Mexico Tort Claims Act waives immunity for

> personal injury, bodily injury, wrongful death, or property damage resulting from . . . .
> [an enumerated list of intentional torts, including battery]. . . . or deprivation of any
> rights . . . . secured by the constitution and laws of the United States or New Mexico
> when caused by law enforcement officers while acting within the scope of their duties.

§ 41-4-12. There are two alternative avenues to state law liability against GCSD in this case: injuries resulting from (1) a battery caused by negligence, or (2) the negligent deprivation of statutory rights.

### A.        Negligence Resulting in Battery According to the Tort Claims Act

There are no special tort rules for law enforcement officers; rather the "entire basis of the [Tort Claims Act] is premised on traditional concepts of negligence such as 'duty' and the reasonable person's standard of care." *Methola v. Eddy County*, 1980-NMSC-145, ¶ 19, 95 N.M. 329, 622 P.2d 234. This interpretation of the Act is said to deter negligent enforcement of the law and to create "more responsive agencies." *Schear v. Bd. of Cnty. Com'rs of Bernalillo County*, 1984-NMSC-079, ¶ 21, 101 N.M. 671, 687 P.2d 728. This construction is also consistent with the Legislature's express command that

the Act is to be construed in accordance with ordinary tort concepts of duty. NMSA 1978, § 41-4-2(B) (1976).

It is well-settled that when a law enforcement officer's negligence in the scope of duty results in a battery, the officer and his employer are liable for the plaintiff's injuries, notwithstanding any provision of sovereign immunity in the Tort Claims Act. *Id.* ¶ 24; *Weinstein v. City of Santa Fe ex rel. Santa Fe Police Dept.*, 1996-NMSC-021, ¶ 22, 121 N.M. 646, 916 P.2d 1313; *Torres v. State*, 1995-NMSC-025, ¶ 25, 119 N.M. 609, 894 P.2d 386; *Ortiz v. New Mexico State Police*, 1991-NMCA-031, 112 N.M. 249, 814 P.2d 117; *see Ford v. New Mexico Dep't of Public Safety*, 1994-NMCA-154, ¶ 22, 119 N.M. 405, 891 P.2d 546 (department-employer vicariously liable).

"The specific form or classification of negligence is not material under Section 41-4-12 of the Act. . . . The only issue with regard to Section 41-4-12 is whether. . . . [the plaintiff] suffered personal or bodily injury resulting from an assault or battery 'caused' by the negligence of law enforcement officers while acting within the scope of their duties." *Davis v. Bd. of Cnty Cmm'rs of Dona Ana County*, 1999-NMCA-110, ¶ 34, 127 N.M. 785, 987 P.2d 1172. Immunity is waived even when an officer's negligence causes a battery by a third party with no relationship to the officer or the plaintiff, subject only to the ordinary elements of any negligence claim, including duty, breach, and proximate cause. *Schear*, 1984-NMSC-079, ¶ 21. Because there is no dispute in this case that Nikki was battered by Cpt. Contreras, the only question is whether any rational jury could conclude that the battery resulted from the negligence of any GCSD officer. That requires an analysis of ordinary tort concepts in New Mexico.

"[Q]uite simply," as the New Mexico Supreme Court has said on at least two occasions, "a law enforcement officer has a duty in any activity actually undertaken to exercise for the safety of others that care ordinarily exercised by a reasonably prudent and qualified officer in light of the nature of what is being done." *Weinstein*, 1996-NMSC-021, ¶ 22; *Cross v. City of Clovis*, 1988-NMSC-045, ¶ 6, 107

N.M. 251, 755 P.2d 589. New Mexico's "ordinary tort concepts" embrace broad standards for duty, disavowing foreseeability considerations as part of the duty analysis, and leaving questions, such as "remoteness of harm," strictly to the jury's analysis of proximate cause and breach unless reasonable minds cannot differ. *Rodriguez v. Del Sol Shopping Ctr. Assocs.*, L.P., 2014-NMSC-014, ¶ 22, 326 P.3d 465. Physical remoteness in time or space between the officer's investigation and the third party's battery *does not* in and of itself bar recovery. *Torres*, 1995-NMSC-025, ¶ 17; *also Milliron v. Cnty of San Juan*, 2016-NMCA-096, ¶ 10, 384 P.3d 1089 ("It is well-established that a law enforcement officer need not be the direct cause of injury to trigger a waiver of immunity under Section 41-4-12.").

Defendants argue that "Plaintiff has no evidence that any Grant County [d]eputies were aware of any domestic violence that would require the arrest of Contreras." Motion at 16. That is nonsense, of course. There was abundant evidence that Cpt. Contreras was committing crimes, including crimes of domestic violence as defined by state law and the county's policies. Defendants were subjectively aware of that; the call to Sgt. Gomez and Dep. Villegas was reported as harassment; Sgt. Gomez referred to the issue as "domestic violence"; and Det. Arellano has acknowledged under oath that Nikki reported various crimes in his presence at El Refugio. In any event, the question for the purposes of state law is whether the officers were negligent, which encompasses negligent investigations, enforcement, and, in fact, "any activity actually undertaken" by law enforcement. *Weinstein*, 1996-NMSC-021, ¶ 22. A jury can easily conclude that the officers breached their duty to Nikki.

**B.      Deprivation of Statutory Rights**

Law enforcement officers are also liable for their violation of constitutional or statutory provisions resulting in bodily injury, personal injury, or wrongful death. *E.g.*, *California First Bank v. State*, 1990-NMSC-106, ¶ 26, 111 N.M. 64, 801 P.2d 646; *McDermitt v. Corrections Corp. of America*, 1991-NMCA-034, ¶ 1, 112 N.M. 247, 814 P.2d 115. In addition to the duty of ordinary care, law enforcement officers have statutory duties to "investigate all violations of the criminal laws of the state

which are called to the attention of any such officer or of which he is aware[.]" NMSA 1978, § 29-1-1 (1979). This duty creates a private right of action in New Mexico. *California First Bank*, 1990-NMSC-106, ¶ 25. Other actionable statutory duties include the duty to apprehend all "disorderly persons" for violating the laws of New Mexico, NMSA 1978, § 3-13-2 (1988), the duty to "cause offenders to keep the peace[,]" NMSA 1978, § 4-41-2 and 4-41-9, the duty to cooperate with the district attorney and diligently file complaints, NMSA 1978, § 4-37-4 (1975), and the duty to hold persons in custody, maintain public order, and make arrests for crimes, NMSA 1978, § 41-4-3(D) (2015). "[T]hese sections secure private rights which may be enforced under the Tort Claims Act." *Weinstein*, 1996-NMSC-021, ¶ 33; *Wachocki v. Bernalillo Cnty Sheriff's Dept.*, 2010-NMCA-021, ¶¶ 22-29, 147 N.M. 720, 228 P.3d 504; *Blea v. City of Espanola*, 1994-NMCA-008, ¶¶ 17-19, 117 N.M. 217, 870 P.2d 755.

In short, the Legislature has decided that police officers in New Mexico have a clear, actionable responsibility to investigate and enforce the law, and that responsibility is particularly important in cases involving allegations of domestic violence. Given the facts described above, whether the officers have met their statutory responsibilities is a jury question.

## C.   Loss of Consortium

Because the Tort Claims Act waives immunity for particular injuries resulting from enumerated torts or rights violations, the New Mexico Supreme Court has already concluded that damages for loss of consortium are available against a local public body as a specie of personal or bodily injury resulting from the underlying tort. *Thompson v. City of Albuquerque*, 2017-NMSC-021, ¶¶ 8-9, 397 P.3d 1279. Immunity is not fairly at issue with respect to Plaintiffs' claim for loss of consortium damages.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendants' Motion for Summary Judgment in whole.

Respectfully Submitted,

**KENNEDY KENNEDY & IVES**

*/s/ Laura Schauer Ives*
Laura Schauer Ives
Joseph P. Kennedy
Adam C. Flores
1000 2nd Street NW
Albuquerque, NM 87102
(505) 244-1400 / Fax (505) 244-1406
lso@civilrightslaw.com
jpl@civilrightslaw.com
acf@civilrightslaw.com

*Attorneys for Plaintiff*

I hereby certify that a true and correct copy of the foregoing was sent to all counsel of record on the day of its filing with the CM/ECF system.

*/s/ Laura Schauer Ives*
Laura Schauer Ives