# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO
_____

KARRI DALTON,
*as the personal representative of the Estate of Nikki Bascom,*
*And Next Friend to M.B., a minor Child, and*
*A.C., a minor child,*
        Plaintiff,

vs.                                  Case No. 2:17-cv-01143-WJ-GJF

TOWN OF SILVER CITY, GRANT COUNTY,
CHIEF ED REYNOLDS, CAPTAIN RICKY VILLALOBOS,
THE ESTATE OF MARCELLO CONTRERAS,
DEPUTY JACOB VILLEGAS, SGT. FRANK GOMEZ,
AND DETECTIVE ADAM ARELLANO,

        Defendants.

## MEMORANDUM OPINION AND ORDER
## GRANTING IN PART AND DENYING IN PART SILVER CITY DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT
## and
## DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

THIS MATTER comes before the Court upon Defendants Town of Silver City's, Chief Ed Reynolds', and Captain Ricky Villalobos' Motion for Summary Judgment as to Equal Protection and Due Process Claims, filed on July 18, 2018 (**Doc. 59**), and Plaintiff's Motion for Summary Judgment as to Count VI, filed July 24, 2018 (**Doc. 63**). Having reviewed the parties' pleadings and the applicable law, the Court finds that Defendants' motion is well-taken in part and, therefore, is **GRANTED IN PART AND DENIED IN PART,** and Plaintiff's motion is not well-taken and, therefore, is **DENIED.**

## BACKGROUND

These claims arise out of Nikki Bascom's murder by her ex-boyfriend, Silver City Police Department ("SCPD") Captain Marcello Contreras. Based on the events of the morning of April 21, 2016 and several incidents in the preceding months, the Silver City Defendants initiated an internal investigation of Cpt. Contreras and placed him on leave but declined to criminally investigate him. Later in the afternoon of April 21, Captain Contreras shot and killed Ms. Bascom, and then himself. Plaintiff alleges that the Defendants treated Ms. Bascom differently from other domestic violence victims and otherwise violated Ms. Bascom's constitutional rights.

On behalf of Ms. Bascom's estate and her minor children, Plaintiff filed this case under 42 U.S.C. § 1983 and the New Mexico Tort Claims Act, alleging the following relevant claims against the Silver City Defendants:

> Count VI: Equal Protection against Chief Reynolds, Captain Villalobos and the Town of Silver City; and
> Count VIII: Substantive Due Process against Reynolds, Captain Villalobos, and the Town of Silver City.

Silver City Defendants filed a motion for summary judgment on the above claims and asserted qualified immunity for the individual Defendants on the Equal Protection and Substantive Due Process claims (Counts VI and VIII). Plaintiff filed a motion for partial summary judgment on the Equal Protection claim as to the Town of Silver City.

## LEGAL STANDARD

A motion for summary judgment is appropriate when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material

fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). As the Tenth Circuit has explained, "mere assertions and conjecture are not enough to survive summary judgment." *York v. AT&T*, 95 F.3d 948, 955 (10th Cir. 1996). To avoid summary judgment, a party "must produce specific facts showing that there remains a genuine issue for trial and evidence significantly probative as to any [material] fact claimed to be disputed." *Branson v. Price River Coal Co.*, 853 F.2d 768, 771-72 (10th Cir. 1988) (quotation marks and citations omitted).

Cross-motions for summary judgment are to be considered independently. The fact that both parties have moved for summary judgment does not permit the entry of a summary judgment if disputes remain as to material facts. *See Buell Cabinet Co. v. Sudduth,* 608 F.2d 431, 433 (10th Cir. 1979). Cross-motions for summary judgments, however, do authorize a court to assume that there is no evidence which needs to be considered other than that which has been filed by the parties. *See Harrison W. Corp. v. Gulf Oil Co.,* 662 F.2d 690, 692 (10th Cir.1981) (citations omitted).

## UNDISPUTED MATERIAL FACTS[1]

The Court has reviewed the parties' assertions of facts and records supporting them. Although the parties raised many disputes, these disputes are generally not *genuine*. Rather, the parties generally argue that each other's facts are incomplete, don't tell the whole story, or object to the characterization of the record. The facts cited below are well-supported in the record.

## I.     SCPD Domestic Violence Policy, Practice, and Training.

Chief Reynolds has been the SCPD chief since approximately 2005. Chief Reynolds is the policy maker for SCPD. SCPD's Domestic Violence policy requires officers to "view domestic violence as a serious crime… take a proactive response to safeguard victim's rights,

---

[1] For brevity, the Court includes one fact section, and where appropriate, will address the differing burdens that arise from cross-motions and the assertion of qualified immunity in the discussion section.

provide victim assistance and use arrest as a deterrent to future violence." **Doc. 63-2, p. 1.** Chief Reynolds agrees that any allegation of domestic violence is a matter of serious concern. In domestic violence cases, SCPD officers are required to "make an arrest if the officer has probable cause to believe that the person has committed or is committing any crime. Arrest is the preferred response to family violence because arrest offers the greatest potential for ending the violence." **Doc. 63-2, p.2**. The "[r]efusal of the victim to sign an official complaint against the offender shall not prevent, nor shall it be a consideration, in an officer's decision to arrest." *Id.* "When a domestic violence crime has occurred, ONLY with extenuating circumstances and the Watch Commander's approval will an arrest not be made. In that instance, a written police report will be made articulating the specific reasons why an arrest was not made." **Doc. 63-2, p. 2.**

SCPD officers learn in their training that it "is very important whenever you have enough to make an arrest to make an arrest." **Doc. 49-12 at 9:17.** SCPD officers are also instructed to get an emergency protection order an arrest warrant as soon as possible if "for some reason the individual is not there to be able to effect an arrest." **Doc. 49-12 at 9:17**. When a call does not result in an arrest, SCPD officers are trained to document the call in a verbal tracking system to protect both victims and officers. SCPD officers also document all domestic violence calls in the CAD system.

In 2015, 137 domestic violence calls resulted in 101 arrests by SCPD officers, for an arrest rate of 74%. In 2016, the year Ms. Bascom was killed, 149 domestic violence calls resulted in 140 arrests by SCPD officers, for an arrest rate of 94%.

Plaintiff cited to eight cases of SCPD officers treating similarly situated domestic violence victims differently from Ms. Bascom. *See* **Doc. 77**, **Plaintiff's UMF U-X.** Generally,

SCPD officers either arrested at the scene, signed a criminal complaint, or sought an arrest warrant where, as here, the assailant (1) pulled a victim over by swerving in front of her car or (2) pulled a cell phone out of the victim's hand. *See* **Plaintiff's UMF U, V, W.** Moreover, officers have interviewed all parties and arrested domestic violence offenders in relatively minor disputes. **Plaintiff's UMF X.** SCPD officers have also arrested and charged domestic violence suspects even over victim's objections, as mandated by SCPD policy.

## II.     SCPD's Internal Investigations Policy.

Chief Reynolds approved SCPD's Internal Investigation Policy. That policy mandates that serious criminal allegations against an officer be referred to an outside agency. There are no provisions for when to arrest an SCPD officer. As to minor allegations, the department has the discretion to refer the matter to an outside agency or proceed to an administrative action. When alleged misconduct is "of a serious nature", the complaint is forwarded to Chief Reynolds. **Doc. 56-7, p.2**.

Chief Reynolds said that the purpose of the referral to outside agencies is to "keep it clean." When SCPD makes a referral, it only provides the name of the complainant and the alleged criminal violation. SCPD refuses to provide any other information in the internal investigation file. For example, SCPD does not disclose any witnesses or any other information.

## III.     Hiring and Retention of Cpt. Contreras.

In 1999, Contreras' then-wife reported to SCPD that Contreras had threatened to shoot her while holding a gun because he believed she was cheating on him. Contreras admitted to pushing his wife but denied threatening her. SCPD charged him with battery on household member. In 2001, SCPD hired him.

In 2003, SCPD criminally investigated allegations that then Officer Contreras had sexually abused a child. SCPD found the allegations to be unsubstantiated. After Ms. Bascom's murder, SCPD received a SD memory card that contained apparent child pornography, including images of 12 to 13-year-old girls undressing and pictures of Cpt. Contreras. SCPD provided the SD card to New Mexico State Police to investigate.

## IV.    Ms. Bascom's Murder.

### A.    Ms. Bascom's Son's March 9, 2016 call.

On March 9, Ms. Bascom's son called 911 to report that Cpt. Contreras and Ms. Bascom were in an argument and that Contreras threatened to shoot himself. Sgt. Arredondo of SCPD and two other officers responded. Ms. Bascom handed them a handgun she had taken from Contreras and told him that "[Contreras] has gone crazy and wants to kill himself." **Doc. 59, UMF 4**. Ms. Bascom said that Contreras had been drinking heavily for two days. He had alcohol on his breath and had bloodshot, watery eyes. Sgt. Arredondo allowed Contreras to back up his truck in the driveway. Sgt. Arredondo is "one of the number one DWI go-getters that makes most of [SCPD's] DWI arrests." Though SCPD officers are trained to interview the 911 caller, the officers on scene did not interview Ms. Bascom's son. Ms. Bascom had bruises that night. It is genuinely disputed whether any officer knew about or saw that bruise.

Dispatch initially classified the call as a "domestic disturbance". Minutes later, the call type was changed to a "welfare check" at the request of one of the responding officers. The dispatcher says the only reason the call type was changed was to protect Contreras. This made it more difficult for agencies to detect a history of domestic violence at the residence. This was the only domestic disturbance call type that had been changed from 2008 to 2016.

Sgt. Arredondo reported the domestic disturbance incident to Chief Reynolds. Chief Reynolds met with Contreras and suggested he take advantage of the employee assistance program. Contreras was not charged with domestic violence, refusal to obey an officer, or DWI as a result of the March 9 call. Moreover, no officer completed a verbal tracking form, which are required and used so officers are aware of volatile situations.

**B.    March 25 and March 28, 2016.**

On March 25, Ms. Bascom called Chief Reynolds to report that Contreras had followed her and harassed Dr. Nelson at Walgreens. She asked Chief Reynolds to get Contreras to stop harassing Dr. Nelson. No officer documented the incident in a verbal domestic violence form, conducted an internal investigation or referred the matter to an outside agency. Chief Reynolds contacted Contreras and told him to "knock it off" and that any further incidents would impact his job. Chief Reynolds met with Contreras on March 28 and promoted Contreras to acting Captain due to a vacancy and gave him a 5% raise.

**C.    April 21, 2016.**

Cpt. Contreras, while on duty, carrying his service weapon, and driving an SCPD car, stopped Ms. Bascom by swerving in front of her car. He took her cell phone when she tried to call 911. Cpt. Contreras then went to Dr. Nelson's home and said "I'm telling you right now you haven't seen the last."

Ms. Bascom went to SCPD to report the incident to Chief Reynolds. She said that Contreras was harassing her and took her phone. Chief Reynolds said at that time he could not get her to say more, which was "disconcerting" because he knew her to be "very vocal". Chief Reynolds sent Cpt. Villalobos to Dr. Nelson's home to ensure he was safe. Cpt. Villalobos called Chief Reynolds and told him Cpt. Contreras had reportedly threatened Dr. Nelson.

Cpt. Villalobos returned to SCPD to take a statement from Ms. Bascom, who was still at the police station. Cpt. Villalobos warned Ms. Bascom she could be charged with false reporting. Ms. Bascom told Cpt. Villalobos that (1) Cpt. Contreras stopped her while driving by pulling his car quickly in front of hers and forcing her to the side of the road; (2) Cpt. Contreras reached into her car and grabbed her phone out of her hands when she was calling 911; (3) she referred to Cpt. Contreras as her boyfriend but also said they were no longer together; (4) she had changed the locks on her home and he did not have a key.

At the same time, Chief Reynolds was meeting with Cpt. Contreras in Ms. Bascom's home to notify him that he was being placed on administrative leave and took his service weapon. He put Cpt. Contreras on leave because he had stopped her while he was on duty and taken her phone and also because he was alleged to have threatened Dr. Nelson. Cpt. Contreras admitted that he was angry; that he had followed Dr. Nelson and Ms. Bascom that morning; that he had pulled over Ms. Bascom and confronted her; and that he had grabbed her phone and left. He said he had also gone to Dr. Nelson's house and confronted him too.

Chief Reynolds stated that he believed Cpt. Contreras' actions "could constitute a criminal act" and a complaint could have been filed against him. **Doc. 77, UMF zzz; Doc. 63-1, p. 134, at 15-16** ("A complaint could have been filed").[2] Chief Reynolds did not inquire whether Cpt. Contreras had any other weapons when he put him on leave but assumed he did.

Chief Reynolds returned to the department and recounted the meeting to Ms. Bascom. She was angry that he left Cpt. Contreras in her home "with all those guns." Cpt. Villalobos told Chief Reynolds that she had reported Cpt. Contreras took the phone from her hand. Chief Reynolds says he intended to refer Cpt. Contreras' phone theft and potential false imprisonment

---

[2] Defendants argue that Chief Reynolds believed he did not have sufficient probable cause to arrest Cpt. Contreras. **Doc. 59, p. 7.** That is not reflected in the record. Rather, Chief Reynolds testified that he did not believe there were extenuating circumstances and that the matter had to be referred out to another agency.

to an outside agency, but neither he nor anyone at SCPD got around to it before Ms. Bascom was killed.

On her way home, Ms. Bascom called 911 to report that Cpt. Contreras was following her. GSCD officers responded and spoke to both of them. Chief Reynolds called GCSD Sgt. Gomez at 12:43 p.m. Though Chief Reynolds knew that GCSD officers were at Nikki's home, neither Chief Reynolds nor anyone else with SCPD contacted them to tell them about his prior conduct.

Later, on her way to the domestic violence shelter, she called 911 to report that Cpt. Contreras was following her there, too. She checked in to the domestic violence shelter at around 1:45 p.m. Cpt. Villalobos called GCSD Sgt. Gomez at 2:09 p.m. and the two spoke for five minutes. GSCD Sgt. Gomez then called Cpt. Villalobos at 2:27 p.m.

Cpt. Villalobos and Chief Reynolds knew that she had reported Cpt. Contreras had followed her to the shelter and that GCSD had responded to the call. No one communicated to the responding GCSD Det. Arellano that GCSD would be responsible for investigating Cpt. Contreras' larceny and false imprisonment. Det. Arellano recognized Contreras' actions could have been crimes, but he claimed he did not need to investigate further because the matter had already been reported to other law enforcement.

Sgt. Yost of the GCSD was patrolling the area around Dr. Nelson's house because of alleged threats to Dr. Nelson. He followed Cpt. Contreras but did not feel that he could have pulled him over. At around 3:30 p.m., Sgt. Yost called Captain Villalobos and Chief Reynolds and told them he was following Cpt. Contreras but did not feel that he had enough information to stop him. Chief Reynolds did not provide any details about Cpt. Contreras' actions toward Ms. Bascom, and Sgt. Yost was not otherwise aware of them.

At around 4:20 p.m., Cpt. Contreras shot and killed Ms. Bascom and then himself. Sgt. Yost told dispatch that he should have stopped Cpt. Contreras and he could have saved her life. The dispatcher responded "we have been dealing with this off and on for over a month now, and its been swept under the rug."

## DISCUSSION

### I. General Law on Equal Protection (Count VI).

"The equal protection clause provides that '[n]o state shall ... deny to any person within its jurisdiction the equal protection of the laws.'" *Grace United Methodist Church v. City of Cheyenne,* 451 F.3d 643, 659 (10th Cir. 2006). "Equal protection is essentially a direction that all persons similarly situated should be treated alike." *Id.* In other words, states "must treat like cases alike but may treat unlike cases accordingly." *Vacco v. Quill*, 521 U.S. 793, 799, 117 S.Ct. 2293, 138 L.Ed.2d 834 (1997).

Although there is no fundamental constitutional right to police protection, the failure to equally "provide police protection is subject to the equal protection clause under [S]ection 1983." *Watson v. City of Kansas City, Kan.*, 857 F.2d 690, 694 (10th Cir. 1988), *cited in Eckert v. Town of Silverthorne*, 25 Fed. Appx 679, 684 (10th Cir. 2001) (unpublished) ("There is no general constitution right to police protection, but if the state provides police protection it is prohibited from irrational discrimination in providing such protection.").

First, to maintain an equal protection claim, Plaintiff has the burden of showing discriminatory intent, and although "[t]he discriminatory purpose need not be the only purpose, [ ] it must be a motivating factor in the decision." *Villanueva v. Carere,* 85 F.3d 481, 485 (10th Cir.1996) (quotation marks omitted).

Second, where, as here, the victim is not part of a protected class and there is no fundamental right at issue, the policy or action at issue must pass the rational basis test. *Price-Cornelison v. Brooks*, 524 F.3d 1103, 1110 (10th Cir. 2008). "In those cases, this court inquires whether the government's classification bears a rational relation to some legitimate end." *Id.* (internal quotation marks and citation omitted).

The Tenth Circuit has twice applied equal protection to claims that domestic violence victims, or sub-classes of domestic violence victims, were treated disparately from similarly situated assault or domestic violence victims. *See Watson*, 857 F.2d at 693 (applied equal protection to class of domestic violence victims treated disparately form similarly situated assault victims)*; Price-Cornelison v. Brooks*, 524 F.3d 1103, 1113 (10th Cir. 2008) (applied equal protection to lesbian domestic violence victims as compared to similarly situated domestic violence victim). In the Tenth Circuit, Equal Protection applies to classes of domestic violence victims, wholly apart from their gender, and even though domestic violence victims are not a protected class. *Id.*

## II.     Silver City Defendants' Motion for Summary Judgment on Equal Protection Claim.

Defendants seeks summary judgment on Count VI, the Equal Protection claim. But Defendants do not appear to address the *Monell* claim. They did not use the word "*Monell*" or the phrase "municipal liability" in their motion. *See* **Doc. 59.** Therefore, as Plaintiff points out, Defendants do not appear to challenge municipal liability in their motion for summary judgment. *See* **Doc. 77, p.20.** However, because the existence of a municipal custom or policy is integral to Plaintiff's Equal Protection claim and was otherwise briefed by Plaintiff, the Court will address the existence of a policy or custom below.[3]

---

[3]Because Defendants do not directly challenge the *Monell* claim or challenge causation, therefore the Court will not address every element of a *Monell* claim. *See Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006) ("[T]o

## A.    <u>Custom or Policy</u>.

In cases such as this, where the complaint alleges a custom or policy of unequal police protection of domestic violence whose assailants are SCPD officers,

> to survive summary judgment, the plaintiff must go beyond her pleadings and show that she has evidence of specific facts that demonstrate that it is the policy or custom of the defendants to provide less police protection to victims of domestic assault [whose assailants are SCPD officers] than to other [domestic violence] victims. She must also provide evidence that discrimination was a motivating factor for the defendants and that she was injured by operation of the policy or custom.

*Watson,* 857 F.2d at 694.

SCPD has a robust domestic violence policy. SCPD's Domestic Violence Policy provides, in sum, that domestic violence assailants are arrested, or an arrest warrant is pursued, if there is probable cause. *See* **Doc. 77, Plaintiff's UMF E-R**. The policy in fact requires responding officers to arrest the suspect upon a finding of probable cause unless there are (1) extenuating circumstances and (2) the watch commander agrees. Based on this policy, 94% of domestic violence calls in 2016 resulted in arrests.

In contrast, SCPD's Internal Investigations policy mandates that any "serious" criminal allegation against an officer be referred to an outside agency. Domestic violence crimes are categorized as "serious" crimes. **Doc. 63-2.** Chief Reynolds justification for this policy is to "keep it clean." However, prior to referring the matter to an outside agency, SCPD must conduct an internal investigation, despite the fact that none of the results of the investigation will be provided. **Doc. 56-7.** The Captain of Investigations may recommend to the Chief of Police that a case be referred to an outside agency for investigation of potential criminal charges. Only the (1) name of the complaining party and (2) alleged criminal violation is forwarded to the outside

---

establish municipal liability, a plaintiff must show: 1) the existence of a municipal policy or custom and 2) a direct causal link between the policy or custom and the injury alleged… In addition, a municipality may not be held liable where there was no underlying constitutional violation by any of its officers.") (internal citations and quotation marks omitted)

agency. Therefore, it appears the report provided by the victim, along with any information gathered during the internal investigation, is not forwarded to the outside agency. There does not appear to be any exception to this policy for exigent circumstances, or any provision for when to arrest or investigate a SCPD officer.

The policies are discriminatory on their face. *See SECSYS, LLC v. Vigil*, 666 F.3d 678, 685 (10th Cir. 2012) ("When a distinction between groups of persons appears on the face of a state law or action, an intent to discriminate is presumed and no further examination of legislative purpose is required."). Domestic violence victims get their claims immediately investigated and receive robust police protection – including mandatory arrest - while victims in Ms. Bascom's situation do not.

Even if the policies are not discriminatory on their face, together they have the effect of providing less police protection to victims such as Ms. Bascom compared to other domestic violence victims. When victims such as Ms. Bascom submit their police reports to SCPD, they do not receive police protection and their reports are not immediately forwarded to outside agencies. Even if their police reports are forwarded to outside agencies, none of the information provided by the victim nor information gathered by officers are forwarded to the outside agencies. In other words, outside agencies are deprived of information that may assist their investigation or provide probable cause.

As explained below, additional evidence, including SCPD's inadequate response to Ms. Bascom's police report compared to similarly situated victims supports a finding that there was a policy or custom of providing less police protection to victims such as Ms. Bascom. **Doc. 77, UMF U-X.**

Therefore, a reasonable jury could conclude that the Town of Silver City had a policy of providing less protection to victims of domestic violence whose assailants were officers of SCPD than to other domestic violence victims.

**B.      Chief Reynolds and Cpt. Villalobos violated Plaintiff's Equal Protection Rights.**

To assert a *Monell* claim, Plaintiff must show that employees of the Town of Silver City personally committed a constitutional violation.   Viewing the evidence in the light most favorable to Plaintiff, the Court finds that a reasonable jury could conclude that Chief Reynolds and Cpt. Villalobos violated Ms. Bascom's Equal Protection rights.

1.      Disparate Treatment.   Initially, the Court notes that Ms. Bascom received disparate treatment compared to other domestic violence victims.   Defendants admitted that: (1) Cpt. Contreras actions could constitute crimes and a criminal complaint could have been filed (2) (2) Cpt. Contreras admitted to Chief Reynolds facts that could constitute larceny and false imprisonment; (3) Cpt. Contreras was not criminally investigated and an arrest warrant was not pursued; (4) the matter was not referred to GCSD, despite the fact that GCSD was investigating other related matters and were in active contact with SCPD.   *Compare* **Doc. 77**, **UMF U-X**.

2.      Discriminatory Intent.   At issue is whether Chief Reynolds and Cpt. Villalobos *intended* to treat Ms. Bascom differently compared to other domestic violence victims.   The Court concludes a reasonable jury could find that Chief Reynolds and Cpt. Villalobos acted at least in *in part* "because of" not merely "in spite of" the differential treatment of Ms. Bascom.

The discriminatory intent element "requires that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of' the law's differential treatment of a particular class of persons."   *SECSYS, LLC v. Vigil*, 666 F.3d

678, 685 (10th Cir. 2012) (internal quotation marks and citation omitted). "So a discriminatory effect against a group or class may flow from state action, it may even be a foreseen (or known) consequence of state action, but it does not run afoul of the Constitution unless it is an intended consequence of state action." *Id.* The plaintiff need not "demonstrate that the challenged action was taken solely for discriminatory purposes; it is necessary only to prove that a discriminatory purpose was a motivating factor." *Watson*, 857 F.2d at 694. "To trigger the first part of the equal protection test, it's enough to say that the governmental action intentionally discriminates between persons." *SECSYS, LLC v. Vigil*, 666 F.3d 678, 689 (10th Cir. 2012).

First, as explained above, the Town of Silver City had a policy of providing less police protection to victims such as Ms. Bascom. The Court may infer that, in treating Ms. Bascom differently, Chief Reynolds and Cpt. Villalobos did so in accordance with the discriminatory policy he put in place. *Price-Cornelison v. Brooks*, 524 F.3d 1103, 1113 (10th Cir. 2008) ("[I]t is reasonable to infer, for purposes of Brooks' motion for summary judgment, that, in refusing to enforce Price–Cornelison's permanent protective order, Brooks was acting pursuant to that [discriminatory] policy."). This is especially true where, here, the policymaker was personally involved in the discriminatory action.

Defendants argue that the purpose of the policy was to "keep it clean." But the actions taken by Defendants – notably, delaying referring out the police reports when they were in active communication with GCSD – does not further any goal of "keeping it clean." Furthermore, delaying filing a criminal complaint or arresting someone who you *admit* there was sufficient information to do so does not further the goal of keeping the investigation clean. A reasonable jury could conclude that the intent was not merely to maintain a "clean investigation", but to provide less protection to victims such as Ms. Bascom.

Second, Ms. Bascom's treatment was a stark outlier compared to how SCPD treated other similar situated domestic violence victims and the protections provided by SCPD's Domestic Violence policy. Where there is a custom or policy of discriminatory treatment, it becomes far less important to compare the victim's treatment to similarly situated individuals. *See* SECSYS, 666 F.3d at 688-89; *Price-Cornelison v. Brooks*, 524 F.3d 1103, 1113 (10th Cir. 2008) (where there was a custom of discrimination, *one* similarly situated case sufficient to satisfy discriminatory intent requirement). In other words, evidence of how the officers treated similarly situated domestic violence victims is not required to prove discriminatory intent. *Id.* Nevertheless, the following support a finding that this disparate treatment is intentional:

- SCPD's inadequate response to Ms. Bascom's police reports is a stark outlier compared to how SCPD treats other domestic violence victims for the same alleged crimes. **Doc. 77, UMF U-X.** *See, e.g., Watson v. City of Kansas City, Kan.*, 857 F.2d 690, 696 (10th Cir. 1988) ("plaintiff's version of events regarding her own situation, if believed, may demonstrate a pattern of deliberate indifference on the part of the Police Department.").
- Failure to document Contreras' domestic violence incidents in the CAD or tracking forms in violation of SCPD policy;
- Willingness to investigate Contreras for domestic violence before he was an officer, but not after;
- SCPD's delay in reporting incidents that Chief Reynolds deemed sufficient to file a criminal complaint, despite being in active communication with GCSD officers.
- Chief Reynolds' express reason for that differential treatment was that Cpt. Contreras was an officer with the department;
- Statistics that show 94% of domestic violence assailants were arrested in the year she was killed.

Defendants summarily argue that none of the cases cited by Plaintiff are in fact similarly situated to Ms. Bascom, but they do not explain why. The Court *sua sponte* notes that none of these similarly situated cases personally involved Cpt. Villalobos or Chief Reynolds. Defendants have not cited to any case that indicates this distinction is fatal. Here, the arrests in cases of similarly situated domestic violence victims were done based on Chief Reynolds' aggressive policy in protecting domestic violence victims. As explained in detail in the fact section above,

Chief Reynolds and Cpt. Villalobos were personally and completely involved in the investigation of Cpt. Contreras and the decision not to seek an arrest warrant. Therefore, under these circumstances, the Court finds that the lack of similarly situated cases involving Chief Reynolds or Cpt. Villalobos personally does not bar the equal protection claim.

The record and undisputed facts show that Chief Reynolds was the undisputed policymaker and had personal involvement in the investigation of Cpt. Contreras and decision not to provide police protection to Ms. Bascom. Therefore, viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could conclude that Chief Reynolds and Cpt. Villalobos violated Ms. Bascom's Equal Protection rights.

C. **Defendants' arguments are unavailing**.

Defendants first argue that Plaintiff cannot maintain an equal protection claim, because Ms. Bascom is not a member of a protected class and no fundamental right is at issue. The Court disagrees. In the Tenth Circuit, an equal protection claim may sound where there is no protected class or no fundamental right. *Watson v. City of Kansas City, Kansas,* 857 F.2d 690 (10th Cir.1988) (equal protection claim for class of domestic violence victims, apart from any gender-based class, allowed to proceed); *Price–Cornelison v. Brooks,* 524 F.3d 1103, 1110 (10th Cir.2008) (claim allowed to proceed where it did not involve any protected class or fundamental right). Here, Plaintiff is not proceeding on any gender-based class, and that is not fatal to her claim.

Defendants argue there were no exigent circumstances to arrest Cpt. Contreras. This argument is a red herring. At issue is whether Defendants declined to provide *police protection*. It is undisputed that Defendants declined to criminally investigate the case or seek an arrest

warrant. Nevertheless, there could be exigent circumstances to arrest Cpt. Contreras, based on the following:

- Cpt. Contreras followed Ms. Bascom, pulling her over, and taking her cell phone from her hand while she called; and confronted Dr. Nelson.
- Ms. Bascom reported the incident to Chief Reynolds.
- Cpt. Contreras confessed in person to the above to Chief Reynolds;
- Cpt. Contreras threatened Dr. Nelson.
- Chief Reynolds knew Cpt. Contreras had access to weapons;
- After the above reports were made, Ms. Bascom reported that Cpt. Contreras was following her two additional times that day.

In other words, these facts show there was a danger to the safety of Ms. Bascom, and the Court believes that a warrantless arrest would likely have held up. Defendants argue that they were not "at the scene", but similarly situated instances show that Defendants are either able to search for and arrest the assailant or seek an arrest warrant and arrest the assailant. **Doc. 77, Plaintiff's UMF U-X Doc. 77-9, p. 6-7** (suspect arrested without warrant for taking victim's cell phone, when suspect was not "at scene" but had driven from the residence to Albertsons).

Defendants argue that they took action by internally investigating Cpt. Contreras, and therefore did not fail to provide police protection or fail to investigate Cpt. Contreras. But Defendants admitted they never intended to criminally investigate Cpt. Contreras, seek an arrest warrant, or forward the results of the investigation or any information gathered during the investigation to GCSD. Therefore, Defendants treated Ms. Bascom differently from similarly situated domestic violence victims by providing her less police protection.

Finally, Defendants argue that they did not have time to refer the matter to GSCD. To the extent this is a causation argument, the Court concludes a reasonable jury could find that there was a delay in providing police protection compared to similarly situated victims and that such delay caused Ms. Bascom's death.

D.    <u>**Class-of-one Equal Protection**</u>.

Plaintiff also asserts her claim is viable under a class-of-one theory.  For similar reasons as above, the Court concludes that a reasonable jury could conclude that Ms. Bascom was singled out and treated differently from similarly situated domestic violence victims.

E.    <u>**Rational basis**</u>.

"[W]here the challenged government action does not implicate either a fundamental right or a protected class, this court will apply a rational basis test. In those cases, this court inquires whether the government's classification bears a rational relation to some legitimate end." *Price-Cornelison v. Brooks*, 524 F.3d 1103, 1110 (10th Cir. 2008) (internal citations and quotation marks omitted).  Here, Defendants do not assert any rational basis for the discriminatory policies in their Motion for Summary Judgment or Reply brief.  *See* **Docs. 59, 86.**  Chief Reynolds only stated rationale for referring the matter to an outside agency (which wasn't done) was to "keep it clean."  While there may be a rational basis to ensure that an investigation is done by an outside agency so that it is not tainted by bias, there is no a rational basis to decline police protection to certain domestic violence victims that are regularly provided to other similarly situated domestic violence victims.  Moreover, there is no rational basis for not *immediately referring* the criminal matter to outside agencies for investigation, especially where the results or information gathered in any continuing investigation would not be shared with any outside agency.

III.    <u>**Plaintiff's Motion for Partial Summary Judgment as to Equal Protection claim is**</u>
<u>**DENIED.**</u>

Plaintiff seeks summary judgment to establish municipal liability on the Equal Protection claim.  She asserts that "municipal liability" should be established as a matter of law, specifically

that "pursuant to an official policy, the named defendants denied Ms. Bascom equal protection under the law." **Doc. 63.**

The Court finds Plaintiff's motion for summary judgment compelling and well argued. However, in viewing the record in the light most favorable to Defendants and drawing all reasonable inferences in Defendants' favor, the Court concludes a reasonable jury could find in Defendants' favor. For example, discriminatory intent here is largely based on inference. A reasonable jury could infer that the policies and actions taken by the Defendants were not *because of* their discriminatory effect on Ms. Bascom, but *in spite of* those effects on her. Therefore, Plaintiff's motion is **DENIED.**

**IV.** **Qualified Immunity as to Equal Protection Claim.**

    **A.**     **Qualified Immunity Standard.**

The individual Silver City Defendants have asserted the defense of qualified immunity, which shields government officials from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Romero v. Story*, 672 F.3d 880 (10th Cir. 2012).

When a defendant moves for summary judgment on the basis of qualified immunity, the plaintiff bears a heavy two-fold burden. *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001). The plaintiff must put forward evidence showing (1) that the defendant violated plaintiff's constitutional rights, and (2) the right at issue was clearly established at the time of the violation. *Id.* If the plaintiff fails to establish either part of the two-part inquiry, the court must grant the defendant qualified immunity. *Id.*

"In determining whether the plaintiff meets this burden, [the Court] ordinarily accept[s] the plaintiff's version of the facts—that is, the facts alleged." *Halley v. Huckaby*, 902 F.3d 1136, 1144 (10th Cir. 2018) (quotation marks omitted). However, Plaintiff's versions of the facts must find support in the record. *Id.* If Plaintiff meets her qualified immunity burden, the Court then conducts a standard summary judgment analysis considering both parties' facts and records. *Id.*, citing *Koch v. City of Del City*, 660 F.3d 1228, 1238 (10th Cir. 2011).

**B.**    **Constitutional Violation.**

As explained above, Chief Reynolds and Cpt. Villalobos were personally involved in the violation of Plaintiff's Equal Protection rights. The Court concluded that a reasonable jury could find that they intentionally treated Ms. Bascom differently from other domestic violence victims because her assailant was an officer and violated her equal protection rights.

**C.**    **Equal Protection Violation was Clearly Established**.

To satisfy her burden of citing to clearly established law, Plaintiff cites to *Watson* and *Price-Cornelison.* In *Watson v. City of Kansas City, Kan.*, 857 F.2d 690, 694 (10th Cir. 1988), the Tenth Circuit clearly established that providing less police protection to victims of domestic violence compared to others may violate Equal Protection. Subsequently, in *Price-Cornelison v. Brooks*, 524 F.3d 1103, 1113 (10th Cir. 2008), the Tenth Circuit clearly established that providing less police protection to sub-classes of domestic violence victims – in that case lesbian victims[4] – compared to other domestic violence victims may violate Equal Protection.

Here, the Court finds it was clearly established that providing less police protection to domestic violence victims whose assailants were officers of the department compared to other domestic violence victims may violate Equal Protection. Defendants not only failed to criminally investigate or seek the arrest of Cpt. Contreras, but at the same time did not

---

[4] The Court notes that neither *Watson* nor *Price-Cornelison* involved any protected classes.

immediately refer the matter to an outside agency to investigate.  This clearly fell far below the level of police protection they provided other domestic violence victims.

## V.     Silver City Defendants' Motion for Summary Judgment on Substantive Due Process Claim.

Silver City Defendants seek summary judgment and qualified immunity on the Substantive Due Process claim (Count VIII).  For the reasons stated below, the Court concludes Silver City Defendants did not violate the Substantive Due Process clause.

### A.     General Law.

The due process clause generally confers "no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 196, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989). Therefore, a state's failure to protect an individual against private violence does not constitute a substantive violation of the due process clause. *Id.* at 197, 109 S.Ct. 998.  An exception exists when a state actor "affirmatively act[ed] to create or increases a plaintiff's vulnerability to, danger from private violence." *T.D. v. Patton*, 868 F.3d 1209, 1222 (10th Cir. 2017), *cert. denied,* 138 S. Ct. 1270, 200 L. Ed. 2d 419 (2018), *quoting Currier, Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001).  Plaintiff must show:

> (1) the charged state entity and the charged individual actors created the danger or increased plaintiff's vulnerability to the danger in some way;
> (2) plaintiff was a member of a limited and specifically definable group;
> (3) defendants' conduct put plaintiff at substantial risk of serious, immediate, and proximate harm;
> (4) the risk was obvious or known;
> (5) defendants acted recklessly in conscious disregard of that risk; and
> (6) such conduct, when viewed in total, is conscience shocking.

*T.D. v. Patton*, 868 F.3d 1209, 1222 (10th Cir. 2017), *cert. denied,* 138 S. Ct. 1270, 200 L. Ed. 2d 419 (2018), *citing Currier*, 242 F.3d at 918.

**B.** **Defendants did not violate Ms. Bascom's Substantive Due Process rights.**

As to this first factor, the Silver City Defendants may very well have increased Plaintiff's vulnerability to the danger by failing to act or failing to share information with other agencies, although there is a real question whether this is sufficient, by itself, to have increased Ms. Bascom's vulnerability to danger. *See Wilson-Trattner v. Campbell*, 863 F.3d 589, 596 (7th Cir. 2017); *Currier v. Doran*, 242 F.3d 905, 920 (10th Cir. 2001) (substantive due process claim survived where defendant failed to investigate bruises *and* removed child from mother's care placed child with abusive father); *T.D. v. Patton*, 868 F.3d 1209, 1229–30 (10th Cir. 2017) (despite being on notice that child was being abused, failed to investigate abuse *and* affirmatively recommended that child remain in abuser's custody); *see also Burella v. City of Philadelphia*, 501 F.3d 134, 147 (3d Cir. 2007) (officers aware of officer-husband's abuse but failure to intervene did not violate substantive due process clause); *Eckert v. Town of Silverthorne*, 25 F. App'x 679, 688 (10th Cir. 2001) (although assailant plainly presented a threat, failure to intervene was not an affirmative action placing plaintiff in harm's way). While this is a close call, the Court finds as to this first factor that Defendants likely increased the danger to Ms. Bascom, because Cpt. Contreras likely would have been arrested if he was not an officer.

Nevertheless, Plaintiff's claim fails on the remaining elements. The evidence does not support a finding that Defendants acted recklessly and in conscious disregard of a risk that was obvious or known. Moreover, the Court cannot say that the City Defendants' actions rise to the level of "assuring" Cpt. Contreras that he would not be punished. Chief Reynolds started an internal investigation, placed him on leave, and took his badge and service weapon. Chief Reynolds clearly told Cpt. Contreras his actions were unacceptable.

Finally, the Court cannot say that the challenged government action shocks the conscience. "It is well settled that negligence is not sufficient to shock the conscience. In addition, a plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power." *Camuglia v. City of Albuquerque*, 448 F.3d 1214, 1222 (10th Cir. 2006). "[T]he plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." *Uhlrig v. Harder*, 64 F.3d 567, 574 (10th Cir. 1995). The Court evaluates "(1) the general need for restraint; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policy decisions impacting public safety." *Currier,* 242 F.3d at 920. Assuming Defendants were negligent or reckless, they attempted to intervene to some degree, and their actions were not so outrageous as to shock the conscience. Therefore, the Silver City Defendants did not violate Ms. Bascom's substantive due process rights.

## CONCLUSION

A reasonable jury could find that Chief Reynolds and Cpt. Villalobos violated Ms. Bascom's Equal Protection rights, and the Court concludes they are not entitled to qualified immunity as to that claim. Plaintiff's Equal Protection *Monell* claim also survives, as a reasonable jury could conclude that there was a policy or custom that violated Ms. Bascom's equal protection rights. Finally, Plaintiff's substantive due process claim is dismissed.

**IT IS THEREFORE ORDERED** that Defendants' Motion for Summary Judgment **(Doc. 59)** is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Partial Summary Judgment **(Doc. 63)** is **DENIED**.

**IT IS FURTHER ORDERED** that **Count VI** remains as to Chief Reynolds, Cpt. Villalobos, and the Town of Silver City.

**IT IS FINALLY ORDERED** that **Count VIII** is **DISMISSED**.

_____
CHIEF UNITED STATES DISTRICT JUDGE